**Traci MICHEL, Individually and as Representative of the Estate of Don Michel, Jr., and as Next Friend of Sydney Michel, Don Michel, Sr ., and Ada Michel, Appellants.**

v.

**ROCKET ENGINEERING CORP., and STC/Mooney Limited, Appellees.**

No. 2–00–112–CV.

Court of Appeals of Texas, Fort Worth.

Feb. 15, 2001.

Braden & Varner, P.C., Michael Braden, Robert R. Varner, Jr., Dallas, for Appellant.

Rose-Walker, L.L.P., Leane Capps Medford, Martin E. Rose, William O. Angelley, Dallas, for Appellee.

Panel B: DAY, LIVINGSTON and GARDNER, JJ.

**OPINION**

GARDNER, Justice.

## I. INTRODUCTION

The question presented is whether a Texas court may exercise personal jurisdiction over non-resident defendants consistent with due process, where the claims asserted are for wrongful death of a California resident resulting from a crash of an aircraft in California that was allegedly caused by defective modification of the aircraft in Washington. Appellants, the surviving widow and minor children of Don Michel ("Decedent"), are also residents of California. Appellants filed suit in Denton County, Texas, naming four defendants.

This appeal is from an order sustaining special appearances of two of the defendants, Appellees Rocket Engineering Corporation ("Rocket") and STC/Mooney Limited ("STC"), both Washington corporations. In one issue, Appellants complain that the order sustaining the special appearances is not supported by factually sufficient evidence. We overrule Appellants' issue and affirm.

## II. JURISDICTIONAL FACTS

Decedent purchased a Mooney M20K aircraft from a business associate in California in 1997. The aircraft had been manufactured in 1979 by Mooney Aircraft Corporation ("Mooney"). Shortly after purchasing the Mooney aircraft, Decedent contracted with Rocket to have it converted to a "305 Rocket." Rocket was formed in 1990 as a Washington corporation with its principal place of business in Spokane, Washington. Rocket's business is primarily the conversion of Mooney aircraft by installation of Continental Teledyne TSIO–520–NB engines onto Mooney M20K airframes. Teledyne engines, manufactured by Teledyne Continental Motors ("Tele-

dyne"), are more powerful than the original engines installed by Mooney.

Teledyne, also a defendant in this case, has its principal place of business in Alabama. Teledyne is a division of Teledyne, Inc., a California corporation with its principal place of business in Los Angeles, California. Mooney is a Texas Corporation with its principal place of business in Kerrville, Texas.

Rocket's president is Darwin Conrad. Conrad had been an electrical contractor, a corporate pilot, and a designated engineering representative, and had worked at several companies engaged in modifying aircraft in the Washington area before forming Rocket as his own business. Conrad had flown Mooney aircraft and aircraft with the Teledyne 520NB engines and developed the idea that combining the two would produce a superior aircraft.

Rocket applied for a "supplemental type certificate" from the FAA in 1991 for its proposed modification of Mooney aircraft by installation of Teledyne 520NB engines. The certificate was issued to Rocket in 1992, authorizing the modification. In May 1994, ownership of the certificate was transferred to STC, a company formed by other individuals to fund the certification process. Rocket obtained a license to use the certificate from STC and began assembling conversions. In 1995, the FAA issued Rocket a second supplemental type certificate authorizing the increased weight of the aircraft that resulted from the installation of a Teledyne engine. An aircraft modified or converted by Rocket pursuant to the two certificates is known as a "305 Rocket."

The contract between Decedent and Rocket for the conversion of Decedent's aircraft to a 305 Rocket was entered into in 1997 in Spokane, Washington, and Rocket also performed the conversion process there. When the conversion was completed, the aircraft was delivered to Decedent in Idaho. On May 5, 1998, following conversion of his Mooney aircraft to a 305 Rocket, Decedent's plane crashed in California while on a flight to Santa Monica, California, from Sacramento.

Rocket has never maintained a registered agent in Texas, has not paid taxes in Texas, nor has it qualified to do business in Texas. Rocket has never maintained an office, warehouse, address, telephone listing, answering service, or other business location in Texas. Rocket has never had any subsidiaries, divisions, or employees in Texas; has no property or bank accounts in Texas; and has never conducted a corporate meeting in Texas.

STC is likewise a Washington corporation with its principal place of business in Spokane, Washington. STC has never maintained a registered agent in Texas, conducted any business in Texas, or qualified to do business in Texas. STC has not had any subsidiaries, divisions, employees, or other business in this state. STC had no contacts with Decedent or Appellants. STC does not sell anything; it merely holds the supplemental type certificates used by Rocket to authorize it to make the conversions of Mooney airframes to 305 Rockets.

Appellants filed suit in Denton County, Texas in April of 1999, naming Mooney, Teledyne, Rocket, and STC as defendants. Appellants alleged that the defendants negligently designed, manufactured, tested, and marketed the aircraft and also alleged strict tort liability. Rocket and STC filed special appearances challenging personal jurisdiction in Texas. Appellants asserted both specific and general jurisdiction over Rocket and STC.

■ After substantial pretrial discovery by the parties limited to the jurisdictional issues, the trial court conducted a hearing

and sustained the special appearances, signing an order dismissing Appellants' claims as to Rocket and STC with prejudice to refiling in Texas.[1] No findings of fact and conclusions of law were filed by the trial court.[2]

## III. STANDARD OF REVIEW

On appeal from an order sustaining a special appearance, we review all evidence in the record to determine whether the non-resident defendant has carried its burden of negating all possible grounds of jurisdiction. *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985); *James v. Illinois Cent. R.R. Co.,* 965 S.W.2d 594, 596 (Tex.App.—Houston [1st Dist.] 1998, no pet.); *Fish v. Tandy Corp.,* 948 S.W.2d 886, 891 (Tex.App.—Fort Worth 1997, writ denied). Existence of personal jurisdiction is a question of law, but that determination may be dependent upon resolution of underlying factual disputes. *James,* 965 S.W.2d at 596; *Conner v. ContiCarriers & Terminals, Inc.,* 944

S.W.2d 405, 411 (Tex.App.—Houston [14th Dist .] 1997, no writ).

We will affirm if we can uphold the trial court's order on any legal theory finding support in the evidence. *Happy Industries Corp. v. American Specialties, Inc.,* 983 S.W.2d 844, 847 (Tex.App.—Corpus Christi 1998, pet. dism'd w.o.j.); *see also Cartlidge v. Hernandez,* 9 S.W.3d 341, 345 (Tex.App.—Houston [14th Dist.] 1999, no pet.); *In re Estate of Judd,* 8 S.W.3d 436, 440 (Tex.App.—El Paso 1999, no pet.); *Fish,* 948 S.W.2d at 892.

We review all questions of law de novo. *Hotel Partners v. Craig,* 993 S.W.2d 116, 120 (Tex.App.—Dallas 1994, writ denied). Underlying fact issues are reviewed under a factual sufficiency standard. *Fish,* 948 S.W.2d at 892; *Conner,* 944 S.W.2d at 411; *Nikolai v. Strate,* 922 S.W.2d 229, 236 (Tex.App.—Fort Worth 1996, writ denied); *Hotel Partners v. KPMG Peat Marwick,* 847 S.W.2d 630, 632 (Tex.App.—Dallas 1993, writ denied).[3]

1. Mooney and Teledyne filed motions to transfer venue. The trial court conducted a hearing on those motions on the same day as the hearing on the special appearances. The court granted the motions to transfer, ordering Appellants' claims against Mooney and Teledyne transferred to Kerr County, Texas. The order on the motions to transfer severed those claims from Appellants' claims against Rocket and STC. Hence, the order granting the special appearances and dismissing the suit as to Rocket and STC is a final judgment. *See Goodchild v. Bombardier–Rotax GMBH Motorenfabrik,* 979 S.W.2d 1, 5 (Tex.App.—Houston [14th Dist.] 1998, pet. denied) (recognizing that orders granting special appearances may be interlocutory, i.e., when other defendants remain in the case, but that severance orders were routinely granted prior to the amendment of section 51.014(a) of the civil practice and remedies code to finalize such orders so as to allow an immediate appeal).

2. Appellants initially requested findings of fact and conclusions of law, but did not file a notice of past due findings as provided by Texas Rule of Civil Procedure 297.

3. We note that the San Antonio Court of Appeals is the only court that applies an abuse of discretion standard of review for the granting or denial of a special appearance. *Compare Joe Guerra Exxon Station v. Michelin Tyre Public Ltd. Co.,* 32 S.W.3d 383, 386 (Tex. App.—San Antonio 2000, no pet.) (reviewing for an abuse of discretion) *and Case v. Grammar,* 31 S.W.3d 304, 307–08 (Tex.App.—San Antonio 2000, no pet.) (same) *with LeBlanc v. Kyle,* 28 S.W.3d 99, 101 (Tex.App.—Texarkana 2000, no pet.) (applying factual sufficiency review); *Daimler–Benz Aktiengesellschaft v. Olson,* 21 S.W.3d 707, 715 (Tex. App.—Austin 2000, pet.filed) (same); *In re Estate of Judd,* 8 S.W.3d at 440–41 (same); *C–Loc Retention Sys., Inc., v. Hendrix,* 993 S.W.2d 473, 476 (Tex.App.—Houston [14th Dist.] 1999, no pet.) (same); *Ball v. Bigham,* 990 S.W.2d 343, 347 (Tex.App.—Amarillo 1999, no pet.) (same); *Cadle v. Graubart,* 990 S.W.2d 469, 471 (Tex.App.—Beaumont 1999,

Where, as here, a reporter's record is available on appeal, the parties may challenge these implied findings by factual sufficiency and legal sufficiency points in the same way they could challenge jury findings or a trial court's findings of fact. *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex.1989). Where sufficiency of the evidence is challenged, the standard of review on appeal is the same as that applied in review of jury findings or a trial court's findings of fact. *Id.; see also Kyle*, 28 S.W.3d at 101.

 Where, as in this case, the trial court has not made findings of fact and conclusions of law, we presume that all factual disputes were found in support of the judgment. *Am. Type Culture Collection, Inc. v. Coleman*, 26 S.W.3d 37, 40 (Tex.App.—Houston [1st Dist.] 2000, no pet.); *Fish*, 948 S.W.2d at 892. We must consider all the evidence that was before the trial court, including pleadings, any stipulations, affidavits, exhibits, the results of discovery, and any oral testimony. *Conner*, 944 S.W.2d at 411; *McCulley Fine Arts Gallery, Inc. v. "X" Partners*, 860 S.W.2d 473, 480 (Tex.App.—El Paso 1993, no writ). We may reverse only if the trial court's implied findings and resulting judgment are so against the overwhelming weight and preponderance of the evidence as to be manifestly wrong. *Fish*, 948 S.W.2d at 892.

## IV. PERSONAL JURISDICTION

 A Texas court may assert personal jurisdiction over a nonresident defendant only if the requirements of due process under the Fourteenth Amendment to the United States Constitution and of the Texas long-arm statute are satisfied. U.S. CONST. amend. XIV, § 1; TEX.CIV.PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997); *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 413–14, 104 S.Ct. 1868, 1871–72, 80 L.Ed.2d 404 (1984); *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex.1996). The long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant doing business in Texas. TEX.CIV.PRAC. & REM.CODE ANN. § 17.042. The Texas Supreme Court has repeatedly interpreted this broad statutory language "to reach as far as the federal constitutional requirements of due process will allow." *CSR Ltd.*, 925 S.W.2d at 594.

 The federal constitutional test of due process consists of two parts: (1) whether the non-resident defendant has purposely established "minimum contacts" with the forum state; and (2) if so, whether the exercise of jurisdiction comports with "fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985); *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 772 (Tex. 1995); *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 230 (Tex.1991). The minimum contacts analysis focuses on whether the non-resident defendant has purposely availed itself of the privilege of conducting

no pet.) (same); *Happy Indus. Corp.*, 983 S.W.2d at 847 (same); *Garner v. Furmanite Australia Party, Ltd.*, 966 S.W.2d 798, 802 (Tex.App.—Houston [1st Dist.] 1998, pet. denied) (same); *Al–Turki v. Taher*, 958 S.W.2d 258, 260–61 (Tex.App.—Eastland 1997, pet. denied) (same). We do not view the amendment to the Texas Civil Practice and Remedies Code, which adds the granting or denial of a special appearance to the list of interlocutory orders that may be appealed, as intending to change previous case law holding that sufficiency of the evidence was the standard of review of a final judgment granting a special appearance. *See* Act of May 27, 1997, 75th Leg., R.S., ch. 1296, § 1, 1997 Tex.Gen. Laws 4936, 4937 (codified at TEX.CIV.PRAC. & REM.CODE ANN. § 51.014(a)(7) (Vernon Supp. 2001)); *Fish*, 948 S.W.2d at 892; *Nikolai*, 922 S.W.2d at 236.

activities within the forum state, thus invoking the benefits and protections of that state's laws. *Guardian Royal,* 815 S.W.2d at 226. A defendant should not be subject to jurisdiction of a foreign court based on "random," "fortuitous," or "attenuated" contacts. *Id.*

## V. MINIMUM CONTACTS

### A. Specific Jurisdiction as to both Rocket and STC

■ A defendant's contacts with a forum can give rise to specific or general jurisdiction. *CSR Ltd.,* 925 S.W.2d at 594. Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2184; *CSR Ltd.,* 925 S.W.2d at 595. The defendant's activities must have been purposefully directed at the forum, and the litigation must result from injuries arising from or relating to those activities. *Guardian Royal,* 815 S.W.2d at 228; *Vosko v. Chase Manhattan Bank, N.A.,* 909 S.W.2d 95, 100 (Tex.App.—Houston [14th Dist.] 1995, writ denied). When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship between the defendant, the forum, and the litigation. *Helicopteros Nacionales,* 466 U.S. at 414, 104 S.Ct. at 1872; *Guardian Royal,* 815 S.W.2d at 228.

■ The causes of action alleged by Appellants are for an aircraft crash in California, resulting from alleged defects in the modifications of the aircraft that were made in Washington. The modifications were made pursuant to a contract entered into in Washington between a California resident and a Washington corporation and, after the modifications were made in Washington, the completed aircraft was delivered in Idaho. The alleged causes of action against Rocket and STC did not "relate[ ] to" or "arise[ ] out of" any activity of either Appellee within the state of Texas, as required for the exercise of specific jurisdiction. *See CSR Ltd.,* 925 S.W.2d at 594–95 (citing *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2184).

■ Appellants nevertheless urge that specific jurisdiction over Rocket and STC may be exercised based upon a theory of civil conspiracy by Rocket and STC with Mooney to cooperate in allowing modifications that Mooney believed were of marginal safety. Appellants emphasize that Rocket's business plan was specifically to engage in modifications of aircraft manufactured in Texas by Mooney, a Texas corporation with its principal place of business in Texas. Therefore, Appellants argue, their causes of action arise, at least in part, out of contacts Rocket had with Texas that are sufficient to create specific jurisdiction.

Specifically, Appellants contend the evidence shows that, in the course of the process of obtaining the certificates from the FAA, Rocket obtained information from Mooney regarding the Mooney aircraft design and specifications, including Mooney's parts manual for the M20K and M20M, portions of its service and maintenance manual, and information obtained from conversations with individuals in its engineering department. Appellants argue that, without the information created and maintained by Mooney in Texas, Rocket and STC could not have obtained the supplemental type certificates from the FAA authorizing the modifications of the Mooney aircraft to 305 Rockets.[4]

---

**4.** Appellants also contend that adoption of the original name "STC/Mooney Limited" for the entity holding the first supplemental type certificate for Rocket is evidence of Appellees' desire to be associated with Mooney. A desire to be associated with Mooney does not

Appellants also assert that Mooney was silent in response to a letter from Rocket's president requesting Mooney's cooperation, evidencing that Mooney somehow acquiesced and approved of the modifications of its aircraft. This evidence, Appellants contend, establishes that their causes of action against Rocket and STC relate to or arise out of the relationship of those parties to Texas so as to establish specific jurisdiction over those parties. These contentions are unsupported by the evidence or the law.

Appellants' assertion of a civil conspiracy was negated by ample evidence. Mooney's assistance was neither sought nor received. Rocket's president, Conrad, acknowledged he never visited Mooney's Texas facility and had no communications with Mooney when Rocket applied for the supplemental type certificates. Rocket purchased no materials or information from Mooney and obtained no information from it for the certificates or for the modifications themselves.

The record affirmatively reflects that, not only did Mooney not cooperate or assist Rocket, but it actively opposed Rocket's efforts to obtain FAA certification for the modifications. The letter from Rocket's president to which Mooney never responded was written in response to concerns Mooney expressed to the FAA, opposing issuance of the supplemental type certificate after learning of Rocket's plans to modify the Mooney M20K airframe.

No inference can be drawn that Mooney acquiesced or approved of the proposed modifications from Mooney's lack of response to the letter from Rocket's presi-

dent because the record is undisputed that Mooney continued to oppose Rocket's proposed modifications. Conrad described Mooney's president's reaction to the proposed modifications as "violent" and acknowledged that animosity between the two companies continued after that time. The evidence shows that Mooney's attitude toward Rocket remained negative at least until 1996, some four years after the first certificate was issued by the FAA, and there is no evidence that it ever changed.

The record is also uncontroverted that the information Rocket obtained and used in obtaining the FAA certificates was not provided by Mooney but generally came from other sources available in the aviation industry. The information consisted of the M20K flight manual, parts manual, service and maintenance manual, and FAA regulations and advisory bulletins. Rocket hired professionals not affiliated with it to assist in certain technical aspects of the design. One of those companies was located in Spokane and another was in California. The information furnished by those companies was submitted to the FAA in the application process.

The Washington company Mike Barry & Associates performed the structural engineering report. Conrad specifically instructed Barry that he could not go to Mooney. The California company Lake Aero Styling & Repair was hired to verify parts numbers for certain components of the M20K. Lake Aero obtained its information from the Mooney parts manuals on hand at its own facility. Lake Aero was an authorized Mooney service center. We hold that there was ample evidence negat-

lead to an inference that Appellees necessarily desired to be associated with a Texas company, as Appellants contend. It is equally likely that they merely desired an association with the name of a "great" aircraft, as described

by Rocket's president, and the trial court could reasonably have so concluded. It is also undisputed that the name STC/Mooney Limited has been changed to "STC Limited," removing the reference to the Mooney name.

ing Appellants' conspiracy theory as a basis for jurisdiction.

 We also agree with Appellees that use of a theory of civil conspiracy in this context to support personal jurisdiction has been foreclosed. *Nat'l Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 773–74 (Tex.1995) (holding that long-arm jurisdiction cannot be based on conspiracy as a "conceptual device" to impute conduct of another within the forum to the defendant, but must rest on contacts of the defendant, itself, with the forum state); *Siskind v. Villa Found. For Educ., Inc.,* 642 S.W.2d 434, 436 (Tex.1982) (holding jurisdiction over non-resident individuals could not be based on conspiracy with corporation); *see also Case,* 31 S.W.3d at 309 (holding acts of co-defendant in Texas held insufficient to confer jurisdiction over non-resident defendants).[5]

 Appellants further argue that there is a sufficient relationship between their contacts with Texas and their causes of action to provide a Texas court with specific jurisdiction because Rocket could not have made the modifications without Mooney's manufacture of the aircraft in Texas some twenty years before. This type of generalized "but for" relationship between the forum and a non-resident defendant falls far short of meeting the requirement for specific jurisdiction that the plaintiff's cause of action must "relate to" or "arise out of" the non-resident's activities within the forum. *Helicopteros Nacionales,* 466 U.S. at 415, 104 S.Ct. at 1872. We hold that the trial court's determination that specific jurisdiction was negated

by Rocket and STC is supported by factually sufficient evidence.

### B. General Jurisdiction as to Rocket

 Under general jurisdiction standards, the cause of action need not arise from nor relate to the activities conducted within the forum state by the nonresident defendant. *CSR Ltd.,* 925 S.W.2d at 595; *Nat'l Indus. Sand Ass'n,* 897 S.W.2d at 772; *see also Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990). In such cases, however, the minimum contacts analysis becomes more demanding; the contacts must be "substantial." *CSR Ltd.,* 925 S.W.2d at 594; *Guardian Royal,* 815 S.W.2d at 228; *James,* 965 S.W.2d at 597. When general jurisdiction is alleged, there must be "continuous and systematic contacts" between the nonresident defendant and Texas. *CSR Ltd.,* 925 S.W.2d at 594; *Guardian Royal,* 815 S.W.2d at 228.

Appellants assert Rocket maintained "continuous and systematic" activities in Texas sufficient to confer general jurisdiction by obtaining the needed information from Mooney in Texas to modify the aircraft; attending national trade shows in Texas; regularly advertising in a national trade magazine; engaging in a national marketing program over a period of several months consisting of a mass mailing of advertising brochures to all Mooney owners, including Texas residents, followed up by telephone calls; entering into distributorship and service agreements, including two such agreements with Texas dealers; making sales of Rocket conversions to Texas residents; and maintaining an internet website for interested, potential customers.

---

5. The Texas Supreme Court has refused to recognize a theory of civil conspiracy based on negligence, emphasizing that, because civil conspiracy is an intentional tort, it cannot arise without specific intent. *Firestone Steel Prods. Co. v. Barajas,* 927 S.W.2d 608, 614 (Tex.1996). It would logically follow that civil conspiracy likewise cannot be based on manufacture or sale of products under a theory of strict liability. However, we need not decide that question given our decision on other grounds.

Our task is two-fold. First, we must determine whether, as Appellants contend, the evidence overwhelmingly establishes that these activities occurred as alleged and to the extent alleged, contrary to any necessarily implied fact findings in support of the judgment. *See Fish,* 948 S.W.2d at 892; *Conner,* 944 S.W.2d at 411; *Hotel Partners,* 993 S.W.2d at 120. If so, in reviewing the trial court's decision *de novo,* we must then determine whether those activities, considered as a whole, constitute "continuing and systematic" activities within the forum state rising to the level of "substantial" contacts and create a general business presence within the forum state to support general jurisdiction, consistent with due process, over Rocket in Texas. *See Fish,* 948 S.W.2d at 892; *Conner,* 944 S.W.2d at 414; *Hotel Partners,* 993 S.W.2d at 120.

### 1. Information allegedly obtained from Mooney in Texas:

We have previously addressed Appellants' first argument regarding the obtaining and use of information regarding the Mooney aircraft. For general jurisdiction purposes, even if the argument were supported by evidence, it would at best be analogous to an argument rejected by the U.S. Supreme Court in *Helicopteros Nacionales de Colombia,* 466 U.S. at 417–18, 104 S.Ct. at 1873–74 (refusing to consider the purchase of most of the defendant's fleet of helicopters in Texas and obtaining training for its pilots in Texas as contacts sufficient for general jurisdiction and holding "mere purchases, even if occurring at regular intervals, are not enough" to warrant exercise of general jurisdiction). In any event, as previously shown, the evidence established that none of the information and documentation relied upon by Rocket was provided by Mooney in Texas but was obtained from other sources.

### 2. Attendance at national trade shows:

Rocket's founder and president, Darwin Conrad, testified by deposition that he annually attended the three largest national trade shows in the industry: the "Oshkosh" in Wisconsin; the "Sun and Fun" in Florida; and trade shows sponsored by a national organization of Mooney aircraft owners, the Mooney Aircraft Pilots' Association ("MAPA") on the east coast, west coast, or in Kerrville, Texas, where that association was headquartered.

In 1991, as part of the process of obtaining the supplemental type certificate, Rocket was authorized by the FAA to modify an M20K as "experimental" and to fly it to different locations for market survey purposes. Conrad took that plane to as many as twenty-five states. He was invited by MAPA to bring it to Texas to that association's annual trade show in Kerrville. Conrad testified that his interest was not in marketing the plane in Texas but, rather, his interest was Mooney aircraft owners. MAPA is a national organization, and its members are Mooney owners all over the world.

Rocket maintained a booth with brochures available at various national trade shows, including the 1992 through the 1997 national MAPA trade shows in Kerrville, Texas. Mooney owners from all over the country attended those shows. The conventions lasted two to two-and-one-half days, during which the booth was allowed to be open approximately two hours in the mornings. Owners of converted 305 Rockets attending the shows gave demonstrations, and Rocket reimbursed them for their out-of-pocket expense. Rocket's policy prohibited it from entering into contracts with prospective customers at trade shows. Conrad's philosophy was to "do your work when you get back home." He would have a Rocket representative follow

up with calls to persons indicating an interest on a sign-up sheet at the booth.

 Each case must turn on its own facts, but we may look to precedent for guidance. *Nikolai,* 922 S.W.2d at 238. Attendance at national conventions within a state does not, standing alone, establish continuous and systematic contacts purposefully directed toward that state that are sufficient to confer general jurisdiction. *See, e.g., Nat'l Indus. Sand,* 897 S.W.2d at 774 (holding no general jurisdiction established although non-resident defendant member attended national meeting in Texas); *Clark v. Noyes,* 871 S.W.2d 508, 519 (Tex.App.—Dallas 1994, no writ) (holding attending and speaking at two national conferences in Texas insufficient to confer general jurisdiction).

Appellants direct us to our decision in *Design Information Systems v. Feith Systems & Software, Inc.,* where we held that a non-resident's participation in trade shows in Texas and its activity in conducting a national advertising campaign constituted activity sufficient for general jurisdiction. 801 S.W.2d 569 (Tex.App.—Fort Worth 1990), *rev'd on other grounds, aff'd. in part,* 813 S.W.2d 481 (Tex.1991). Contrary to Appellants' argument, our holding in *Design Information* was not based upon advertising or the attendance of trade shows, but was based on the fact that the defendant's business in Texas was shown to have built up to twenty-five customers. *Id.* at 571. We said, "[w]e find that *such repeated sales transactions* with residents of this State constitutes the 'continuing and systematic contacts' [required for jurisdiction]." Id. (emphasis added). Additionally, the facts in *Design Information* are distinguishable in that the plaintiff was a Texas resident whose cause of action arose out of and was directly related to the sale and shipment of the allegedly defec-

tive product to him in Texas by the non-resident defendant. *Id.*

### 3. Advertising in national publications:

 Appellants produced evidence that Rocket regularly placed advertisements in the *"MAPA Log,"* a monthly magazine with worldwide circulation to member owners of Mooney aircraft and published from MAPA's headquarters in Kerrville, Texas. In those advertisements, Rocket would give advance notice to Mooney owners of its attendance at a future MAPA convention and would invite them to visit Rocket's booth. All Rocket advertisements were "generic" in character, in that none were specifically modified to be directed to Texas citizens. Rocket placed its advertisements by making telephone calls, sending faxes, and mailing photos to MAPA's headquarters in Kerrville.

 Advertising in national or even international media, as contrasted with state or local publications directed specifically at Texas residents, is not evidence of systematic and continuous activities purposefully directed at Texas for purposes of general jurisdiction. *See, e.g., Hayes v. Wissel,* 882 S.W.2d 97, 98 (Tex.App.—Fort Worth 1994, no writ) (holding airplane seller's advertisement in international TRADE A PLANE magazine insufficient to confer jurisdiction where seller did not advertise in state or local publications); *Clark,* 871 S.W.2d at 519 (holding publication of articles in national professional journals not sufficient to constitute purposeful availment of privileges and protection of forum state); *C.W. Brown Mach. Shop, Inc. v. Stanley Mach. Corp.,* 670 S.W.2d 791, 792 (Tex.App.—Fort Worth 1984, no writ) (holding non-resident seller who advertised in two national publications lacked minimum contacts with Texas); *see also Siemer v. Learjet Acquisition Corp.,* 966 F.2d 179, 183–84 (5th Cir.

1992) (holding advertisements in national journals, together with mailing information to Texas customers and Texas sales insufficient for general jurisdiction), *cert. denied,* 506 U.S. 1080, 113 S.Ct. 1047, 122 L.Ed.2d 356 (1993); *Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 376 (5th Cir. 1987) (holding nationwide advertisements, together with other contacts with Texas, insufficient for general jurisdiction where defendant made no effort to limit states in which product marketed); *Kervin v. Red River Ski Area, Inc.,* 711 F.Supp. 1383, 1391 (E.D.Tex.1989) (recognizing that it is well-established that advertising in a nationally circulated publication is not sufficient to establish jurisdiction within a particular forum).

Appellants rely upon *Lujan v. Sun Exploration & Production Co.,* but that case is distinguishable in that the publication in which the non-resident defendant advertised apparently limited its distribution to the "Permian Basin" area of Texas and New Mexico. 798 S.W.2d 828, 831–32 (Tex.App.—Dallas 1990, writ denied). The defendant in that case had entered into contracts to perform work in Texas and regularly performed oil field services in Texas totaling over four hundred trips to Texas in a ten-year period. *Id.* at 831. Appellants' reliance on *Hargrove v. Underwriters at Lloyd's, London,* is also misplaced in that the defendant there sent newsletters directly to Texas clients rather than placing advertisements in national publications. 937 F.Supp. 595, 606 (S.D.Tex.1996)

We do not find the evidence regarding Rocket's advertising in the nationally or internationally distributed *"MAPA Log"* to be an activity purposefully directed at Texas, nor do we consider it significant that Rocket directed telephone calls, faxes, and mail to MAPA's Texas headquarters simply for the purpose of placing those advertisements for national or international distribution. Those actions were no more directed at Texas residents than the advertisements, themselves.

### 4. Distributor–Dealer agreements:

■■■ Appellants also rely on two distributor-dealer contracts with Texas dealers. There was evidence that Rocket entered into distributor-dealer agreements with aircraft distributors across the country. Rocket entered into an agreement from 1992 until December 1995 with All American Aircraft, Inc., an aftermarket Mooney distributor, with its principal office in Texas. Although All American was based in San Antonio, it sold aircraft, conversions, and modifications in the states of Florida, New Mexico, Arkansas, Louisiana, and Oklahoma, as well as Texas.

■■■ Affidavits of Conrad, Rocket's president, and Ken Shoup, All American's general manager, sharply differed on certain facts related to the distributor-dealer agreements. Because no fact findings were filed, we will presume that the disputed facts were resolved to support the trial court's order. *See Fish,* 948 S.W.2d at 892. Conrad testified that the agreements were not negotiated or executed in Texas. Conrad further testified that All American bought no converted aircraft from Rocket. Instead, All American bought unconverted Mooney aircraft elsewhere and delivered them to Rocket for conversion.

All conversions were then performed by Rocket in Washington. Rocket performed no "speculative" conversions, but did only custom work. As a part of its distributor-dealer contracts, All American agreed to purchase two conversions per year from Rocket for resale. All American had a Rocket conversion performed on one aircraft, which it maintained as a demonstrator at its Texas facility in San Antonio.

Conrad estimated that ten Rocket conversions were sold through All American to Texas residents out of a total of more than 200 conversions sold over the seven-year period prior to this suit.

All American also agreed to serve as a service facility for warranty work on Rocket conversions. The warranty consisted of reimbursing a facility for work done. No special procedures or formal training was required. If a service center could work on a Mooney aircraft or a Teledyne engine, it could work on a Rocket. Rocket sent parts and payments on occasion to service facilities for warranty work, including two facilities in Texas—once to Don Maxwell Services, Inc. and once to another facility in Texas.

Appellants offered an unsigned affidavit of Don Maxwell, principal shareholder of Don Maxwell Services, Inc., in Gladewater, Texas, and an affidavit regarding a phone conversation between Appellants' attorney and Maxwell to prove that Maxwell was a representative of Rocket in Texas. Rocket and STC offered a verified, counter-affidavit of Maxwell and a copy of a dealer certificate with an attached commission agreement stating that Maxwell agreed only to refer customers to Rocket in return for a commission on any sale made. Maxwell confirmed that his company was not currently an authorized dealer or service center for Rocket and that the agreement had only been for one year, 1998. No Rocket conversions were sold as a result of any referrals by Maxwell.

Most of Maxwell's work was on Mooney aircraft, and the agreement simply allowed a service center to perform work on Mooney aircraft and Teledyne engines. Further, under the agreement, Maxwell received no formal instructions from Rocket and did not generally buy parts from Rocket. Conrad recalled only one instance where Maxwell performed warranty work on a Rocket conversion.

The cases relied on by Appellants do not support their proposition that the evidence regarding the distributor-dealer agreements establishes contacts with Texas sufficient to confer general jurisdiction. For example, Appellants rely on *Temperature Systems, Inc. v. Bill Pepper, Inc.*, in which the relationship and transactions between a non-resident distributor Temperature Systems, Inc. (TSI) for Carrier Air Conditioning and distributors in Texas were held sufficient to create general jurisdiction over that defendant. 854 S.W.2d 669, 676 (Tex.App.—Dallas 1993, writ dism'd by agr.). The *Pepper* case is distinguishable in that the evidence there showed that an inter-distributor relationship had continuously existed between TSI and the Texas distributors, pursuant to which TSI transferred to and purchased equipment from the Texas distributors over a period of twenty years. *Id.* at 672. In contrast, Rocket's distributorship agreement with All American lasted only about two-and-one-half years, at most, and its agreements with Don Maxwell Services lasted only for one year.

Additionally, unlike the distributorship agreements here, which had terminated, there was evidence in the *Pepper* case that the inter-distributor relationship with Texas distributors would continue into the future. *Id.* The agreement with All American terminated in 1996, and the agreement with Maxwell was only for the year 1998. Neither agreement remains in effect. Moreover, Rocket did not purchase equipment from All American in Texas or enter into contracts with All American in Texas. All American sent customers to Rocket for conversions to be done at its facility in Washington. Also, unlike the Texas distributors that TSI dealt with in *Pepper*, All American also sold to customers in states

other than Texas, including Arkansas, Florida, Oklahoma, Louisiana, Alabama, and New Mexico.

Appellants next rely upon *General Electric Co. v. Brown & Ross International Distributors, Inc.,* in which the evidence established that the non-resident defendant, Brown & Ross, had entered into a licensing agreement in 1983 with a Texas company to be its sales agent for General Electric parts in Texas. 804 S.W.2d 527, 531 (Tex.App.—Houston [1st Dist.] 1990, writ denied). The evidence further established that the Texas company engaged in "substantial" and "routine" sales of counterfeit General Electric parts distributed in Texas. *Id.* After signing the agreement, Brown & Ross changed its letterhead to show Houston as its business address. *Id.*

Here, the uncontroverted evidence showed that Rocket has never listed a Texas location as its business address or delivered a converted Rocket aircraft in Texas. Rocket's only office is in Washington, and Rocket performed all of its work on customer's aircraft in Washington and delivered the finished products in Idaho or Washington. Only ten conversions were sold through All American's efforts in Texas out of over two hundred conversions sold by Rocket over a seven-year period. We do not find that number to be "continuous", "systematic," or "substantial" in contrast to the sales in *Pepper* or *General Electric.* Furthermore, Rocket proved that no sales were made of conversions through Don Maxwell Services. The non-use of that distributorship for any sales and only an "occasional" servicing of a Rocket by Maxwell cannot be characterized as substantial activities in Texas.

In at least two cases more closely analogous to this one, appellate courts have refused to find that general jurisdiction was established by evidence of distributors or dealers in Texas. In *Bearry v. Beech Aircraft Corp.,* Louisiana residents purchased a Beech aircraft in Louisiana and were killed when their plane crashed in Mississippi on a flight to Baton Rouge, Louisiana. 818 F.2d at 372. The survivors of the Louisiana residents filed suit in Texas, alleging defective design of the aircraft. *Id.* Beech was a Delaware corporation with its principal place of business in Kansas. Beech had engaged in a nationwide advertising campaign from 1980 to 1985, during which nearly $250 million of Beech manufactured products flowed to seventeen independent Texas dealers, one of which was a wholly owned subsidiary of Beech. *Id.* at 372. Beech representatives also visited its Texas dealers at their request to assist them with maintenance problems, demonstrate new aircraft, and provide sales incentives. *Id.* at 373. The district court attributed the dealers' activities to Beech, finding that the existence of the distribution system in Texas established conduct by Beech in that forum. *Id.* at 373 n. 2.

The Fifth Circuit reversed, holding that this evidence could not support general jurisdiction. *Id.* at 375–76. In particular, with regard to the Beech dealers, the court held that the existence of the dealership system in Texas could not be attributed to Beech because the dealers were independent and Beech lacked control over their operations. *Id.* The Texas distributors in this case are, likewise, independent, and the relationship of Rocket to the Texas distributors is similarly lacking in control.

Appellants argue that *Jones v. Beech Aircraft Corp.,* weakens the decision in *Bearry.* 995 S.W.2d 767 (Tex.App.—San Antonio 1999, pet. dism'd w.o.j.). To the contrary, in finding that Beech had continuous and systematic contacts in *Jones,* the San Antonio Court of Appeals pointed out that the nature of Beech's relationship to

its Texas subsidiaries has changed since the *Bearry* decision, in that the evidence showed that Beech now controls its subsidiary's daily operations, and the subsidiary's business purpose is limited to employing sales representatives to sell Beech's aircraft in Texas. *Id.* at 771.

The evidence sufficiently negates any attempt to attribute activities of the dealer to Rocket so as to establish continuing and systematic contacts. Rocket's agreement with All American was only for some two-and-one-half years, ending in 1995. Further, its agreement with Don Maxwell was only for one year, and in each agreement, Rocket lacked control over the day-to-day operations of the independent dealers. Thus, we hold the mere existence of these agreements were not of such a substantial nature as to allow the exercise of general jurisdiction over Rocket and STC by a Texas court.

### 5. Rocket's website:

 Appellants offered evidence that Rocket maintained a website, accessible to Texas residents via the Internet, where potential customers could send information to Rocket as to their interest in a conversion, and a Rocket representative could then contact them with additional information. The evidence establishes that the website was activated in late 1999.[6]

 We do not believe that Rocket's website establishes a purposeful contact with this state that would, standing alone, establish a basis for general jurisdiction. Internet use is characterized as falling within three categories on a sliding scale for purposes of establishing personal jurisdiction. *Jones*, 995 S.W.2d at 772; *see also Mink v. AAAA Dev. LLC.*, 190 F.3d 333, 336 (5th Cir.1999). At one end of the scale are websites clearly used for transacting business over the Internet such as entering into contracts and knowing and repeated transmitting of files of information, which may suffice to establish minimum contacts within a state. *Jones*, 995 S.W.2d at 772. At the other end are "passive" websites used only for advertising over the Internet, which are not sufficient to establish minimum contacts even though they are accessible to residents of a particular state. In the middle are "interactive" websites, which allow "exchange" of information between a potential customer and the host computer. *Id.* at 772–73. Jurisdiction in cases involving interactive websites must be determined by the degree of interactivity. *Id.* at 773.

In *Jones*, the website displayed advertising, including an e-mail icon, and allowed the user to input information to which the host *could then respond* by directing the user to the nearest customer representative in Texas. Under those circumstances, i.e., allowing response by the host computer, the San Antonio Court of Appeals held that the website was "interactive." *Id.* Although the court opined that, standing

---

6. The accident on which suit is based occurred May 5, 1998, and this suit was filed in April 1999. Contacts occurring after suit is filed have been held irrelevant in determining whether a defendant's contacts are "continuous" and "systematic." *Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784, 787 (5th Cir.1990); *Preussag Aktiengesellschaft v. Coleman*, 16 S.W.3d 110, 126 (Tex.App.—Houston [1st Dist.] 2000, pet. filed). Moreover, Texas courts have indicated that contacts occurring after the date of injury are not relevant. *Preussag*, 16 S.W.3d at 126. Because we hold that the website is "passive," it is unnecessary to determine whether the date the website became operational is of any significance. As well, it can hardly be argued that activation of the site within a couple of months of the date suit was filed constitutes "continuous and systematic" contacts as required for general jurisdiction.

alone, the website was insufficient to confer general jurisdiction, the court nevertheless held that it could be considered a "factor" in determining whether general jurisdiction should be exercised. *Id.*

In *Mink*, the Fifth Circuit Court of Appeals characterized a website as "passive" and insufficient to confer jurisdiction, absent other contacts, where the customer could send information to the host but there was *no opportunity for response* by the host computer. 190 F.3d at 336. The court further held that the fact that the website contained an e-mail link did not change its decision. *Id.*

Rocket's website was similar to that at issue in *Mink.* Rocket could *not* respond directly over the Internet to information furnished by a potential customer on the website. Using the information furnished by the potential customer, a sales representative would follow up by personal contact. We hold that Rocket's website was "passive" advertising via the Internet and not a purposeful activity directed toward residents of this state to be considered in determining whether general jurisdiction exists.

### 6. Sales:

In 1995, Rocket hired Ed Quist as a salesman to handle a national marketing campaign. Quist and Conrad tried to organize owners of Rocket conversions around the United States as a sales force, offering them commissions in return for referrals. Quist also conducted a national mass mailing of advertising brochures on the Rocket conversion process to all Mooney owners. Mailings were sent to all Mooney owners listed on call-in sheets in response to the national advertising as well as to all owners who had signed up at trade shows across the country as expressing an interest. Quist obtained a CD ROM listing the approximately 3,000 owners of Mooney aircraft from TRADE-A-PLANE, a national trade publication.

Quist divided the mailings to the owners into six geographical regions of the United States. The decision was guided by the call-ins and sign-up sheets to show where the most interest was generated and by areas of concentration of Mooney owners. California ranked as the largest area in terms of interest shown by inquiries from callers. The New York Pennsylvania area was also very "big." Texas ranked second or third in terms of inquiries from interested callers. Although Quist testified that he devoted equal time to all three areas, Quist and Conrad also agreed that Texas probably ranked second or third in prioritizing their focus. Quist sent mailings to the California and New York Pennsylvania areas first, followed by cold calls to the Mooney owners in those areas, including Texas residents.

The process of calling all Mooney owners took a number of months, but apparently extended over a period of less than one year. Quist was only employed by Rocket from 1995 to 1996 and was succeeded by Greg Goeden, who did not carry forward the mass mailing campaign and who made no cold calls. Goeden would make contact with a customer only if the customer initiated action.

All contracts were sent to customers to sign and then were returned to and signed by Rocket in Spokane. Payment was made for the conversion process at Spokane. Rocket tried to facilitate getting customers' aircraft to Spokane where all of the conversion work was performed. In Spokane, Rocket kept the customer abreast of the progress of the conversion process and would help get them to the facility in Spokane or nearby Coeur d'Alene, Idaho, for delivery of the completed aircraft. Final payment was brought by the customer to be paid upon completion.

Up to ten hours of flight training were given to customers in Spokane or Couer d'Alene, upon completion of their conversions. Customers were contacted after delivery of completed Rocket conversions by periodic calls, and Rocket sent mandatory service bulletins to all Rocket conversion owners on three occasions as required by the FAA.

Testimony was disputed as to how many Rocket conversions have been sold to Texas residents. Out of over 200 conversions, there is evidence that Rocket sold a total of eleven 305 Rocket conversions and five similar "300 Missile" (non-turbo charged) conversions of Mooney aircraft to Texas residents. Ten of those sales were made through All American.[7] Assuming that these Texas sales amounted to about $1,000,000 of business, as contended by Appellants, they account for less than ten per cent of Rocket's total market.

Appellants argue that the evidence of Rocket's sales and marketing efforts in Texas overwhelmingly establishes continuous and systematic contacts sufficient to confer general jurisdiction. Appellants rely on *Siskind v. Villa Foundation for Education, Inc.*, where the supreme court concluded that advertising in national publications and local telephone directories and sending informational packets and applications for admission and re-enrollment to the plaintiff's Texas residence supported jurisdiction. 642 S.W.2d 434, 436 (Tex. 1982). However, *Siskind* involved specific, rather than general, jurisdiction. *Id.* The causes of action for breach of contract and misrepresentations in violation of the DTPA asserted in *Siskind* arose directly out of the materials sent to the Texas resident plaintiff. *Id. Siskind* has no application here on the issue of general jurisdiction.

We believe that *Bearry* properly addresses the issue of sales, and we follow its reasoning. The Fifth Circuit Court of Appeals in that case directly addressed the issue of whether general jurisdiction was created solely because a "large quantity of products manufactured by the [non-resident defendant] had flowed into Texas during the past five years." 818 F.2d at 372. In its national marketing campaign, Beech engaged in nationwide advertising, like Rocket in this case, and sold over $250 million in Beech products to Texas residents through Texas distributors during that period. *Id.* at 372. Beech also manufactured and sold $72 million of airframe assemblies to Bell Helicopter in Texas and Beech facilities in Kansas. *Id.* at 373. Beech had seventeen independent dealers in Texas, as well as a Texas subsidiary, and Beech representatives occasionally visited Texas at the request of its dealers to assist them with maintenance problems, demonstrate new aircraft, and offer sales incentives. *Id.*

Refusing to disregard the evidence that Beech had carefully structured the sales to require the negotiation, performance, and completion of contracts in Kansas and that Beech had no control over its independent distributors or even over its subsidiary, the Fifth Circuit held that the flow of millions of dollars of products to Texas residents did not create "continuous and systematic" contacts by Beech, purposefully directed toward Texas citizens, such that general jurisdiction was created. *Id.* at 377.

---

7. The majority of sales to Texas residents were through All American. Appellants produced six contracts for conversions that were ultimately performed by Rocket, which were purchased by All American for customers. A seventh contract produced by Appellants was not performed. Three other contracts were produced that were performed directly by Rocket for Texas residents.

The evidence in this case is of sales that are far fewer and for much less revenue in comparison to the evidence in *Bearry.* Conversely, the evidence is in no way comparable to that in *Jones v. Beech Aircraft Corp.,* also relied upon by Appellants, where the San Antonio Court of Appeals found general jurisdiction over Beech based on, among other activities, sales to Texas residents. 995 S.W.2d at 774. First, the evidence in *Jones* showed numerous other direct contacts with this state, and second, Beech angered the court by refusing to produce *any* evidence of the level of its sales to Texas residents in that case, causing the court of appeals to infer evidence of sales against it. *Id.* at 771–72 & n. 1. We conclude that the evidence in this case of approximately nineteen sales to Texas residents over a period of seven years, constituting less than ten per cent of its total sales, does not, standing alone, constitute evidence of "continuous and systematic" activity sufficient to support general jurisdiction over Rocket.

### 7. *Totality of Contacts:*

■ While none of Rocket's activities within Texas is sufficient, standing alone, to establish general jurisdiction, the inquiry for determining whether minimum contacts exist to establish general jurisdiction "demands … that all contacts be carefully investigated, compiled, sorted, and analyzed for proof of a pattern of continuing and systematic activity." *Schlobohm,* 784 S.W.2d at 359. Where, as in this case, the cause of action does not "arise out of" or "relate to" the defendant's purposeful conduct within the state, more contacts are required than for specific jurisdiction because the forum state has no direct interest in the case. *Bearry,* 818 F.2d at 374. The inquiry for general jurisdiction purposes is "broader and more demanding" than for specific jurisdiction, requiring a showing of "substantial activi-

ties" within the forum state, and those activities must still be "purposefully" directed into the forum state. *Id.* Finally, the important focus of our inquiry must be on the nature and quality of the defendant's contacts rather than only on the sheer number. *Guardian Royal,* 815 S.W.2d at 230 n. 11.

■ We believe that the evidence relied on by Appellants establishes that Rocket regularly advertised in a national trade journal. Over a seven-year period, Rocket's president and a salesman attended national trade shows around the country, including six in Kerrville attended by Mooney owners from all over the United States. Rocket maintained a booth for two days for approximately two-and-one-half-hours per day, made advertising materials available to Mooney owners at its booth, and provided a sign-up sheet for persons interested in a conversion. Rocket mailed brochures to all Mooney owners nationwide and followed up with cold calls. While Rocket focused on the Southwest and Texas as its second or third area in priority, nothing in the evidence indicates that Texas residents were specifically targeted. Rather, Rocket targeted all Mooney owners in all of its marketing.

Rocket entered into distributor agreements around the country, including a one-year contract in Texas with an independent distributor, who referred no customers to Rocket and performed minimal service work, and a two-and one-half year independent distributor agreement in Texas that resulted in sales of ten conversions. The independent distributor agreement was terminated in 1996. Rocket performed approximately nineteen conversions in Washington for residents of Texas over a seven-year period, amounting to less than ten percent of Rocket's total

sales. Upon completion, the conversions were delivered in Washington or Idaho.

In similar cases involving far more contacts than those of Rocket, both state and federal courts in Texas have held that the test of continuous and systematic purposeful activity in this state was not met. The leading United States Supreme Court case is *Helicopteros Nacionales,* in which neither the plaintiffs nor the decedent were Texas residents or had any ties to Texas, the helicopter crash that killed the decedent did not occur in Texas, and the alleged misconduct did not take place in Texas. 466 U.S. at 413–14, 104 S.Ct. at 1872. That court held the defendant's contacts with Texas insufficient to establish general jurisdiction, even though the defendant had negotiated the contract for transportation of the decedent with his employer in Texas, purchased approximately eighty percent of its helicopter fleet from a Texas seller, and sent pilots and other personnel to Texas to be trained. *Id.* at 411, 104 S.Ct. at 1870.

In *Siemer v. Learjet Acquisition Corp.,* the plaintiffs were foreign nationals who sued as survivors of decedents killed in a plane crash in Egypt. 966 F.2d at 180. The defendant, a Kansas aircraft manufacturer, actually had a registered agent in Texas. *Id.* at 181. A wholly owned subsidiary of the defendant transacted business in San Antonio, and the defendant advertised in national journals distributed in Texas and mailed sales information to prospective customers located in Texas. *Id.* Slightly more than one percent of its sales were to Texas residents. *Id.* Nevertheless, the court had no difficulty finding lack of general jurisdiction based on *Helicopteros Nacionales* and the "clear precedent" of *Bearry. Id.*

In *Reyes v. Marine Drilling Co.,* the plaintiff was injured while working at an unknown location on an off-shore drilling rig designed by the non-resident defendant headquartered in Mississippi. 944 S.W.2d 401 (Tex.App.—Houston 1997, no writ). The defendant's numerous contacts with Texas included advertising on several occasions in Texas publications for employees; purchasing goods in excess of $183 million in Texas from at least 471 Texas vendors, as well as $63 million in products from another seller; entering into contracts with a Houston company for services and repairs; selling $851,511.88 worth of scrap metal to Texas companies; and sending representatives to Texas on at least 204 occasions to inspect data, facilities, or equipment. *Id.* at 402–03. Finding the purchases irrelevant under *Helicopteros Nacionales,* the advertising for employees "isolated or disjointed," and the sale of the scrap metal merely "sporadic sales," the court held that the standard of "continuous and systematic" contacts for general jurisdiction was not met. *Id.* at 404–05.

Appellants, as previously stated, rely on the *Jones* case, which reversed the grant of a special appearance in a suit brought by survivors, all foreign nationals, of persons killed in an airplane crash in New Zealand. 995 S.W.2d at 774. Distinguishing *Bearry,* the *Jones* court not only noted that circumstances had changed with regard to the relationship between Beech and its subsidiaries and that Beech now exercised control over the daily operations of a wholly owned subsidiary that employed four designated sales representatives in Texas, but that Beech provided technical support for Texas operators of Beech aircraft, maintained three service centers in Texas, displayed the "Beechcraft" logo on vehicles at Houston Hobby airport, maintained a telephone listing in its name in Houston, and maintained an interactive website. *Id.* at 772.

*Jones* is distinguishable from this case in that the two short-term distributor dealers

of Rocket in Texas were independent dealers with no day-to-day control, and Rocket has no subsidiary in Texas, maintains no telephone listing in Texas, and has only a passive website that became operational only recently. Importantly, *Jones* is also distinguishable because the evidence in that case established that Beech also had other contacts in Texas that were related to the plaintiffs' cause of action. The aircraft had been sold to a Texas resident in 1969, was operated in Texas and Oklahoma for the previous fifteen years, and had been modified in Texas in 1976, including installation of engines and a Beech part. *Id.* at 773. The *Jones* plaintiffs alleged that *the modifications made in Texas* caused the plane to be defective. *Id.* The evidence also showed that Beech had been a party to a similar investigation of a prior, similar accident in Texas. *Id.* It was these contacts that the San Antonio Court of Appeals held, *when combined with the sales* to Texas residents, rendered the contacts between Beech and Texas sufficient to confer general jurisdiction in *Jones.* *Id.* at 773. No such circumstances exist in this case.

Additional cases in which multiple contacts with Texas combined with numerous sales to residents were held insufficient to create general jurisdiction include *Dominion Gas Ventures, Inc. v. N.L.S., Inc.*, 889 F.Supp. 265, 267 (N.D.Tex.1995) (finding no general jurisdiction even though defendant had registered agent in Texas and engaged in oil-well cleaning and other services for at least eight Texas companies totaling four to seven percent of its total business); *Luna v. Compania Panamena De Aviacion, S.A.*, 851 F.Supp. 826, 833 (S.D.Tex.1994) (holding general jurisdiction not established where defendant airline sold tickets in Texas through independent agents, had toll free number accessible to Texas residents, and had even overhauled some of its engines in

Texas). Considering the totality of the activities of Rocket in light of the well-established principles for establishing general jurisdiction, we conclude that there is sufficient evidence negating general jurisdiction by establishing that Rocket's contacts with Texas were neither "continuous and systematic" nor "substantial," as required to create a general business presence in Texas. *Siemer*, 966 F.2d at 181, 183; *Conner*, 944 S.W.2d at 414.

## C. General Jurisdiction over STC

Appellants argued that Rocket's contacts with Texas could be attributed to STC through an agency or alter ego theory, but the evidence negates both theories. STC originally loaned money to Rocket to fund the project of obtaining the supplemental type certificates from the FAA. The initial supplemental type certificate was thus put in STC's name. STC's president is Gary Hofstrand. The two principals of STC are Tracy Stevens and Gary Hofstrand, both of whom reside in Washington.

Darwin Conrad has never been a shareholder in STC. The record establishes that Rocket and STC are separate corporate entities with different shareholders, officers, and directors, and that the two corporations have separate meetings of their shareholders and directors, keep separate records, and file separate tax returns. The initial loan from STC to Rocket has been paid back to the owners of STC, who are passive investors. They will eventually obtain a return on their investment when Rocket makes more money.

Appellants rely upon this court's opinion in *Nikolai v. Strate* for the proposition that "contacts by a corporation's representative undertaken on behalf of the corporation will be imputed to the corporation for

jurisdictional purposes." 922 S.W.2d at 240. However, the holding in that case specifically related to an attorney's contacts with Texas in a malpractice action. *Id.* at 240. Nothing in *Nikolai* suggests that its holding should be extended to impute contacts of one corporation to an entirely separate corporation. Moreover, because the evidence negates any theory under which the contacts of Rocket with Texas may be considered sufficient to create general jurisdiction over Rocket, imputing Rocket's contacts to STC avails nothing to Appellants.

## VI. FAIRNESS

■ In addition to "minimum contacts," due process requires that the assertion of personal jurisdiction must comport with traditional notions of "fair play and substantial justice." *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 114, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987); *Nat'l Indus. Sand Ass'n,* 897 S.W.2d at 772. The following factors, when appropriate, should be considered: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Asahi,* 480 U.S. at 113–15, 107 S.Ct. at 1033–34; *Guardiạn Royal,* 815 S.W.2d at 231.

■ Where a Texas resident is pursuing a cause of action for harm committed within this state, the fairness considerations have little impact. "Only in rare cases ... will the exercise of jurisdiction not comport with fair play and substantial justice...." *Guardian Royal,* 815 S.W.2d at 231. Where the cause of action is not connected to this state and neither of the parties is a resident of this state, however, fairness becomes of paramount importance. *Jones v. J.P. Sauer & Sohn,* 27 S.W.3d 157, 161 (Tex.App.—San Antonio 2000, pet. denied) (holding examination of minimum contacts unnecessary to determine whether exercise of personal jurisdiction would be constitutional where evidence establishing that jurisdiction should not be exercised based on "fair play and substantial justice").

■ Even if we considered that Appellees had minimum contacts here sufficient to satisfy due process, the evidence presents a compelling case that asserting personal jurisdiction over them does not comport with principles of "fair play and substantial justice." *Guardian Royal,* 815 S.W.2d at 230 (noting that it is incumbent upon defendant to present "a compelling case that the presence of some other consideration would render jurisdiction unreasonable.") (quoting *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2174).

Rocket's only facility and office, together with the majority of its related documents and witnesses, are located in Spokane, Washington, where its plan for the Rocket conversion was conceived and developed and where all conversions have been performed. That Rocket's president and a salesman visited Texas once a year for two-day trade shows indicates that the burdens of bringing witnesses and documents covering a seven or eight-year period over one thousand miles to Texas for trial would not be substantial. *See M.G.M. Grand Hotel, Inc. v. Castro,* 8 S.W.3d 403, 409–10 (Tex.App.—Corpus Christi 1999, no pet.) (considering burden on defendant to litigate in another state as factor in determining whether assertion of personal jurisdiction comports with fair play and substantial justice). However, Rocket is a small enterprise with only Conrad and one employee comprising the

sales force. Moreover, Conrad, the company's president who is actively involved in the day-to-day business, as well as Hofstrand, president of STC, would likely be required to be present throughout trial. *See J & J Marine, Inc. v. Le,* 982 S.W.2d 918, 927 (Tex.App.—Corpus Christi 1998, no pet.) (noting company established by defendant was small and would be adversely affected with all employees likely to be called as witnesses and presence of president, active in business, would likely be required throughout trial).

In contrast, while Appellants have named Mooney Aircraft Corporation as a defendant, Rocket and STC appear to be their primary targets. Appellants have identified no distinct interest in litigating in Texas, rather than in Washington, where STC and Rocket are located, or in California—their home state and the location of the plane crash. *See Bearry,* 818 F.2d at 377 (noting plaintiffs, residents of Louisiana, had no distinct interest in litigating cause of action in Texas for Mississippi plane crash); *James v. Illinois Cent. R.R. Co.,* 965 S.W.2d 594, 599 (Tex.App.—Houston [1st Dist.] 1998, no pet.) (noting lack of interest of non-resident plaintiffs in litigating in Texas for injury with no relation to Texas).

Most importantly, Texas has no interest in adjudicating this controversy. California plaintiffs are suing Washington defendants for a cause of action based on a California plane crash allegedly caused by modifications performed in Washington to an airplane having no connection to Texas other than that it was manufactured in Texas some twenty years before. *See, e.g., Bearry,* 818 F.2d at 377 (holding suit by Louisiana plaintiff against Kansas aircraft manufacturer for plane crash in Mississippi implicated no distinct interest in Texas); *Guardian Royal,* 815 S.W.2d at 233 (holding Texas had no compelling interest in

providing forum for resolution of dispute between two non-resident insurers); *James,* 965 S.W.2d at 599 (holding Texas had no interest in adjudicating dispute where neither party was resident and cause of action did not arise in Texas).

■ Texas arguably has a general interest in the quality and safety of Rocket's conversion process because some of its converted aircraft have come into the state and because the airframes for these conversions were originally manufactured in Texas. However, as noted in *Bearry,* the "concerns that injuries might occur in the state or might somehow implicate Texas component-part manufacturers are adequately protected." 818 F.2d at 377. This is so because Rocket would be subject to the specific jurisdiction of Texas courts when and if its product causes injury in Texas. *See id.* "Assertion of such broad interests do not suffice, however, to override the burdens placed upon [Appellees] by this lawsuit." *Id.*

■ Further, we must weigh the interests of Washington and California along with that of Texas, in considering the interstate judicial system's interest in obtaining the most efficient resolution of the controversy as well as the "shared interest of the several states" in furthering fundamental social policies. *Guardian Royal,* 815 S.W.2d at 228. Sales of some Rocket conversions to Texas residents would possibly give Texas some social interest in resolving the controversy, but California has a greater interest in the substantive social policies relating to the sale and distribution of Rocket conversions: the plane crash occurred there; Decedent was a California resident; his survivors are California residents; and Decedent acquired the aircraft in California and apparently never had a connection to Texas after its manufacture. *See Jones,* 27 S.W.3d at 162 (holding Louisiana had greater interest

than Texas in resolving suit where death occurred there, plaintiffs resided there, and revolver had no connection to Texas). Finally, it appears that California law will apply, and either California or Washington will provide the most efficient resolution because of the availability of witnesses and evidence in either of those states. *See Bearry,* 818 F.2d at 377; *Jones* 27 S.W.3d at 162; *see also Guardian Royal,* 815 S.W.2d at 233; *James,* 965 S.W.2d at 599. *We overrule Appellant's sole issue.*

## VII. CONCLUSION

While this case is close, we will not substitute our judgment for that of the trial court. There is factually sufficient evidence that Rocket and STC lack minimum contacts with Texas to provide a Texas court with personal jurisdiction over them, that the exercise of personal jurisdiction over Rocket and STC would not comport with fair play and substantial justice, and that Rocket and STC negated personal jurisdiction under any legal theory pleaded by Appellants. Accordingly, the trial court's order granting Rocket and STC's special appearance is affirmed.