Affirmed in Part and Reversed and Remanded in Part and Opinion
filed October 8, 2009.

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-08-01064-CV

_______________

 

ALL STAR ENTERPRISE, INC. A/K/A BERNARD WELL SERVICE,
ANTERO RESOURCES CORPORATION, ANTERO RESOURCES PICEANCE CORPORATION, AND
FRONTIER DRILLING, L.L.C., Appellants

 

V.

 

ERIN BUCHANAN, INDIVIDUALLY, AS REPRESENTATIVE OF THE
ESTATE OF JOSEPH BUCHANAN, JR., AND AS NEXT FRIEND OF CHRISTOPHER D. BUCHANAN
AND TAYLOR N. BUCHANAN, MINORS, Appellees

 

On Appeal from the 113th District Court

Harris County, Texas

Trial Court Cause No. 2007-53955

 

O P I N I O N








In this wrongful-death and survival action, four nonresident defendants
appeal the denial of their respective special appearances.  Because the Texas
contacts of All Star Enterprise, Inc., Antero Resources Piceance Corp., and
Frontier Drilling, L.L.C. are insufficient to establish general or specific
jurisdiction, we reverse the trial court=s rulings as to them and remand the
claims against them for severance and dismissal.  The Texas contacts of Antero
Resources Corporation, however, are sufficient to support general jurisdiction,
and the exercise of such jurisdiction does not offend traditional notions of
fair play and substantial justice; thus, we affirm the trial court=s denial of its special appearance. 

I.  Factual
and Procedural Background

On July 19, 2007, Joseph AJay@ Buchanan, Jr. was killed by a piece of falling equipment
while working at a drilling rig known as Rig No. 3 in the Piceance Basin of
Garfield County, Colorado.  At the time of his death, Jay, his wife, and his
minor children were citizens of Louisiana temporarily residing in Colorado, but
by the time his wife, individually and on behalf of the children and her late
husband=s estate (collectively, ABuchanan@), filed this wrongful-death action
in Harris County, Jay=s survivors again resided in Louisiana.  On August 30, 2007,
Buchanan sued (a) Halliburton Company, (b) All Star Enterprise, Inc.
d/b/a Bernard Well Service (AAll Star@), and (c) Antero Resources Corporation (AAntero@).  On October 12, 2007, Buchanan
added Frontier Drilling, L.L.C. (AFrontier@) as a defendant, and on March 7,
2008, Antero Resources Piceance Corporation (APiceance@) was added to the suit.  All Star,
Antero, Piceance, and Frontier each filed a special appearance, and each was
denied by the trial court.  In this interlocutory appeal, each presents a
single issue challenging the trial court=s denial of its special appearance.

II.  Standard
of Review

The plaintiff bears the initial burden of pleading sufficient allegations
to bring a nonresident defendant within the provisions of the long‑arm
statute.  BMC Software Belg., N.V. v. Marchand, 83 S.W.3d 789, 793 (Tex.
2002).  The nonresident defendant then bears the burden of proof to negate all
bases of personal jurisdiction asserted by the plaintiff.  Moki Mac River
Expeditions v. Drugg, 221 S.W.3d 569, 574 (Tex. 2007). 








The determination of whether the trial court has personal jurisdiction is
a question of law.  BMC Software, 83 S.W.3d at 794.  If a trial court
must resolve disputed questions of fact before resolving the jurisdictional
issue but renders no findings of fact, the trial court=s implied factual findings may be
challenged for legal and factual sufficiency where, as here, the appellate
record includes both the reporter=s record and the clerk=s record.  Id. at 794B95.  On appeal, we consider all of
the jurisdictional evidence before the trial court.  Fish v. Tandy Corp.,
948 S.W.2d 886, 891 (Tex. App.CFort Worth 1997, pet. denied).  If the special appearance is
based upon undisputed or established facts, the appellate court conducts a de
novo review of the trial court=s order.  Conner v. ContiCarriers & Terminals, Inc.,
944 S.W.2d 405, 411 (Tex. App.CHouston [14th Dist.] 1997, no writ). 

III.  Governing Law

It is well-established that our state courts may properly exercise
personal jurisdiction over a nonresident corporate defendant only if federal
due process requirements and the requirements of the Texas long-arm statute are
satisfied.  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S.
408, 412B13 (1984).  Because the personal
jurisdiction of Texas courts extends A>as far as the federal constitutional
requirements of due process will permit,=@ we rely on precedent from both
federal and state courts in determining whether a nonresident defendant has met
its burden to negate all bases of jurisdiction.  BMC Software, 83 S.W.3d
at 795 (quoting U‑Anchor Adver., Inc. v. Burt, 553 S.W.2d 760, 762
(Tex. 1977)).  State statutory and federal due-process requirements are
satisfied if (a) the nonresident corporation has certain minimum contacts
with Texas, and (b) our exercise of personal jurisdiction over the
nonresident does not offend Atraditional notions of fair play and substantial justice.@  See Helicopteros, 466 U.S.
at 412B13; Int=l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). 

A.        Minimum Contacts








The first of these requirements, that of sufficient minimum contacts, is
satisfied if the nonresident defendant has A>purposefully avail[ed] itself of the
privileges of conducting activities within the forum State, thus invoking the
benefits and protections of its laws.=@ Burger King Corp. v. Rudzewicz,
471 U.S. 462, 475 (1985) (quoting Hanson v. Denckla, 357 U.S. 235, 253
(1958)).  The Apurposeful availment@ requirement ensures that a nonresident corporation will not
be haled into a foreign jurisdiction based on A>[t]he unilateral activity of those
who claim some relationship@ with the defendant or as the result of A>random,= >fortuitous,= or >attenuated= contacts.@  Id. (quoting Hanson,
357 U.S. at 253); Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774
(1984). 

To determine whether the nonresident corporate defendants have
purposefully availed themselves of the privileges of conducting business within
the State of Texas, three factors are relevant here.  See Michiana Easy
Livin= Country, Inc. v. Holten, 168 S.W.3d 777, 785 (Tex. 2005).  First, we consider
only each defendant=s own actions.  Id.   Second, the acts of each
defendant must be Apurposeful,@ rather than random, isolated, or fortuitous.  Id. 
Third, each Adefendant must seek some benefit, advantage, or profit by >availing= itself of the jurisdiction.@  Id. (citing World-Wide
Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).  Because Aall contacts [must] be carefully
investigated, compiled, sorted, and analyzed for proof of a pattern of
continuing and systematic activity,@ we do not consider any of a
defendant=s contacts in isolation, but instead apply these factors to all of each
nonresident defendant=s contacts with Texas.  Schlobohm v. Schapiro, 784
S.W.2d 355, 359 (Tex. 1990).  A[I]t is not the number, but rather the quality and nature of
the nonresident defendant=s contacts with the forum state that [are] important.@  Guardian Royal Exch. Assurance,
Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 230 n.11 (Tex. 1991).

B.        Fair Play and Substantial
Justice








The plaintiff bears the initial burden to show that assertion of personal
jurisdiction fulfills the second due-process requirement, i.e., that it
comports with traditional notions of fair play and substantial justice.  In
re S.A.V., 837 S.W.2d 80, 85 (Tex. 1992).  But as we have previously noted,
A[s]ometimes the exercise of
jurisdiction may not be reasonable even if the nonresident defendant has
purposely established minimum contacts with the forum state.@  Conner, 944 S.W.2d at 411
(citing Guardian Royal Exch., 815 S.W.2d at 228).  If the defendant has
established such minimum contacts, then it is the defendant who bears the
burden to present a compelling argument establishing that the exercise of
jurisdiction would be unreasonable.  Id. (citing Guardian Royal Exch.,
815 S.W.2d at 231)).  In making this determination, courts may consider factors
such as the burden on the defendant, the interests of the forum state in
adjudicating the dispute, the plaintiff=s interest in obtaining convenient
and effective relief, the interstate judicial system=s interest in obtaining the most
efficient resolution of controversies, and the shared interest of the states in
furthering fundamental substantive social policies.  Burger King Corp.,
471 U.S. at 476B77; Guardian Royal Exch., 815 S.W.2d at 231.  Such
factors may establish the reasonableness of the exercise of personal
jurisdiction upon a lesser showing of minimum contacts than otherwise would be
required, but rarely will support a finding that the exercise of jurisdiction
is contrary to the principles of fair play and substantial justice.  Project
Eng=g USA Corp. v. Gator Hawk, 833 S.W.2d 716, 722B23 (Tex. App.CHouston [1st Dist.] 1992, no writ). 
Most fairness considerations instead may be accommodated without finding the
exercise of personal jurisdiction unconstitutional.  Guardian Royal Exch.,
815 S.W.2d at 231 (citing Burger King, 471 U.S. at 477)).

C.        Specific Jurisdiction

There are two types of personal jurisdiction: specific and general. 
Specific jurisdiction is dispute-specific, and it attaches when the plaintiff=s cause of action arises out of or
relates to the nonresident defendant=s contacts with the forum state.  Conner,
944 S.W.2d  at 410.  To invoke a state=s specific jurisdiction, the
defendant=s activities must have been Apurposefully directed@ to the forum, id., and there
must be a substantial connection between the defendant=s forum contacts and the operative
facts of the litigation.  Moki Mac, 221 S.W.3d at 585. 








In her live pleadings, Buchanan contends the trial court has jurisdiction
over appellants because Athey do business in Texas, maintain continuing, systematic
contacts with Texas, maintain agents for service of process in Texas and/or are
amenable to service in Texas.@  Thus, Buchanan has asserted the existence of facts which,
if true, would support the trial court=s exercise of general jurisdiction. 
Although Buchanan did not plead facts that purport to substantially connect any
appellant=s contacts with Texas to the operative facts of this litigation, the
existence of specific jurisdiction appears to have been tried by consent of the
parties.  See Tex. R. Civ. P.
67; see also Olympia Capital Assocs., L.P. v. Jackson, 247 S.W.3d 399,
412 (Tex. App.CDallas 2008, no pet.) (concluding that an unpleaded basis for
jurisdiction was tried by consent when addressed by the parties in a motion for
reconsideration and the response to the motion). 

D.        General Jurisdiction

Because general jurisdiction is Adispute blind@ and requires contacts of a Acontinuous and systematic@ nature, it is more difficult to
establish than specific jurisdiction.  See Helicopteros, 466 U.S. at 414B16; Int=l Shoe, 326 U.S. at 320.  To determine
whether a nonresident defendant has continuous and systematic contacts with
Texas sufficient to support general jurisdiction, we examine the defendant=s contacts and forum-related activities
up to the time that suit was filed.  PHC-Minden, L.P. v. Kimberly-Clark
Corp., 235 S.W.3d 163, 170 (Tex. 2007).  Buchanan sued All Star and Antero
on August 30, 2007, Frontier on October 12, 2007, and Piceance on March 7,
2008; thus, for the purposes of establishing general jurisdiction, only
contacts before the date applicable to that defendant are relevant. 

IV.  All Star

In support of its special appearance, All Star produced the affidavit of
its owner, Terry Huckins, who attested to the following:

$       
All Star is a Colorado corporation
with its principal place of business in Garfield County, Colorado.

$       
It has no offices, shareholders,
bank accounts, leases, real property, vehicles, chattel, business personal
equipment, loans, notes, promissory notes, or other stock in Texas.

$       
No Texas resident has any
ownership interest in All Star.

$       
All Star has no Texas address or
phone number.

$       
All Star has never performed any
services in Texas or entered into any contracts in Texas for services to be
performed elsewhere.








$       
It does not advertise in Texas,
recruit employees in Texas, or maintain a website.

$       
All Star does not have, and is not
required to have, a registered agent in Texas.

$       
All Star was not
served with process in Texas, and has never previously been sued in Texas.

Buchanan offered no evidence controverting these facts.  Instead, she
contends that All Star=s minimum contacts with Texas are to be found in its
contracts with third parties, its relationship to others who have a Texas
address, its previous operation of a mail-order business, and its purchases
from Texas vendors. 

A.        Master Service Agreement
with Oxy USA WTP LP 

As one of the points establishing All Star=s minimum contacts, Buchanan relies
on a Master Service Agreement between All Star and Oxy USA WTP LP (AOxy@) executed just twenty-eight days
before Jay=s death.  In this contract, All Star and Oxy agreed that Oxy Amay from time to time request that
[All Star] perform services and/or provide materials to [Oxy]@ and that such requests, referred to
as Acommercial terms,@ would  establish the scope of All
Star=s work and compensation.  The
contract does not require work to be performed in Texas.[1] 









Buchanan emphasizes that Oxy and All Star agreed that Texas law would
apply to the contract Aexcept where otherwise provided in the commercial terms.@[2]  Although choice-of-law provisions
are properly considered in minimum-contacts analysis, substantially more is
required to meet the threshold requirements for general jurisdiction.  See
Burger King, 471 U.S. at 482 (explaining that Florida choice-of-law
provision combined with twenty-year relationship with company=s Miami headquarters Areinforced [franchise owner=s] deliberate affiliation with the
forum State@).  Buchanan also relies on a contract provision in which All Star and
Oxy agreed to Avoluntarily submit to the jurisdiction of the courts of Harris County,
Texas for the adjudication of their liabilities and responsibilities under this
agreement.@  But if the mere existence of an agreed forum-selection clause in a
particular contract were sufficient to establish general jurisdiction, then
courts of the forum state generally would not need to determine if a dispute
against a nonresident party to the agreement fell within the scope of the
forum-selection clause, because the clause=s mere existence would result in
general jurisdiction.  We know, however, that this is not the case.  See,
e.g., Deep Water Slender Wells, Ltd. v. Shell Int=l Exploration & Prod., Inc., 234 S.W.3d 679, 687 (Tex. App.CHouston [14th Dist.] 2007, pet.
denied) (explaining that when determining whether to enforce a mandatory forum‑selection
clause, courts first must determine whether the asserted claims fall within the
clause=s scope).  The forum-selection clause
at issue here may be better understood as an agreement that the litigation of
certain identified disputes will be instituted in Texas and the parties to the clause
will waive objection to the exercise of specific jurisdiction in those cases. 
Nevertheless, the failure to challenge personal jurisdiction in a case in which
a Texas court apparently would be able to exercise specific jurisdiction does
not demonstrate that a nonresident defendant has the continuous and systematic
contacts with Texas necessary for the exercise of general jurisdiction.  Johns
Hopkins Univ. v. Nath, 238 S.W.3d 492, 501 (Tex. App.CHouston [14th Dist.] 2007, pet.
denied).  Here, moreover, the forum-selection clause was not utilized; Oxy and
All Star did not engage in Texas litigation to determine their respective
rights and obligations under their agreement. 








In urging us to accord greater significance to such choice-of-law and
choice-of-forum provisions, Buchanan relies on Project Engineering USA Corp.
v. Gator Hawk, Inc., 833 S.W.2d at 722.  There, the First Court of Appeals
found sufficient contacts to sustain the trial court=s exercise of general jurisdiction
over a nonresident corporation based primarily on evidence that the corporation
had been a representative or distributor for three different Texas companies
for years, and these relationships required frequent contact between the
companies and the defendant.  Id.  One of the distributorship agreements
not only specified the application of Texas law in a Texas venue, but also was 
executed in Houston and had been in place for ten years.  Id. at 720.  
At least one sale was made pursuant to the contract.  Id.   An oral
representation agreement with another Texas company had been in effect for six
years.  Id. at 720B21.  

Analogizing All Star=s contract with Oxy to the contacts described in Gator
Hawk, Buchanan argues it was foreseeable that All Star would be haled into
a Texas court.  But A[f]oreseeability alone has never been a sufficient benchmark
for personal jurisdiction under the Due Process Clause.@  HMS Aviation v. Layale Enters.,
S.A., 149 S.W.3d 182, 195 (Tex. App.CFort Worth 2004, no pet.) (citing World‑Wide
Volkswagen, 444 U.S. at 295).  Although All Star reasonably should have
anticipated that it could be called into a Texas court to respond to a lawsuit
involving its contract with Oxy, that contract is totally unrelated to Buchanan=s claims.  Moreover, the longstanding
distributorship agreements discussed in Gator Hawk created substantially
stronger ties than those instituted by All Star=s contract with Oxy.  Unlike the Gator
Hawk agreements, the Oxy contract itself neither required nor permitted All
Star to perform any work for or render any service to Oxy unless Oxy submitted
an additional request, governed by its own commercial terms, that was
independently accepted by All Star.  There is no evidence that either of these
events occurred.








  B.     PXP Master Service
Agreement

Buchanan also relies on a Master Service Agreement between All Star and
Plains Exploration & Production Company and its subsidiaries (collectively,
APXP@).  We note at the outset that there
is no connection between the operative facts of this litigation and the PXP
contract, which was executed after Jay=s death.  Cf. Nogle & Black
Aviation, Inc. v. Faveretto, No. 14-08-00272-CV, 2009 WL 943872, at *4B5 (Tex. App.CHouston [14th Dist.] July 30, 2009,
no pet. h.) (holding that a nonresident defendant=s contract with a Texas-based
individual to design an inspection procedure for a wing spar supported specific
jurisdiction where plaintiffs asserted negligence in the design and inspection
of the wing spar).  Buchanan does not contend that All Star solicited the
contract; rather, it is undisputed that All Star=s relationship with PXP began after
PXP purchased one of All Star=s existing Colorado clients.  The record does not show that
All Star performed any services under the contract in the six weeks between its
execution and the date suit was filed.  

Buchanan nevertheless argues that the contract obligated All Star to
perform work in Texas, Amaintain contacts pertaining to the contract through Texas,@ and be bound by Texas law.  She
further asserts that All Star contractually agreed to submit to Texas
jurisdiction and venue.  Buchanan cites no specific provision for any of these
contentions nor have we found any that support her argument.  To the contrary,
the contract contains no provisions concerning jurisdiction, forum, or venue,
and does not require All Star to perform work in Texas.  Moreover, the
choice-of-law provision provides that Athis Contract shall be governed,
construed, and enforced in accordance with the General Maritime Law@; under the terms of the contract,
Texas law applies to the contract=s construction only if general
maritime law does not.  Because Buchanan=s arguments concerning the
substantive terms of this contract are unsupported by the record, they are
unpersuasive.

C.        Texas Addresses of Other
Entities








Buchanan additionally relies on various documents that list a Texas
address for a person or business with some connection to All Star.  For
example, under the terms of their contract, All Star is required to send
notices, bills, or other communications to PXP=s Houston address.  Buchanan further
points out that PXP operates from Texas, and that it is the holder of a
certificate of liability insurance in which PXP=s address is stated to be in Texas
and in which All Star is named as an additional insured.  She also cites a
provision in All Star=s contract with Oxy concerning the manner in which invoices
may be submitted: although Oxy maintains a physical and mailing address in
Colorado and has expressed its preference that All Star submit invoices
digitally, the terms of the contract also permit All Star to mail invoices to
Oxy at a Texas post-office box.[3]

Although Buchanan argues that these writings support a finding that All
Star has the requisite minimum contacts with Texas, we may consider only the
defendant=s own actions.  See Michiana Easy Livin= Country, 168 S.W.3d at 785.   This evidence
cannot support a finding of jurisdiction because it demonstrates only the
unilateral choices of third parties who have some connection to All Star,
rather than contacts and conduct by All Star.  See Burger King, 471 U.S.
at 475 (explaining that jurisdiction cannot be based on the unilateral activity
of a third party); U‑Anchor Adver., Inc., 553 S.W.2d at 763
(explaining that a nonresident who agrees to and actually remits payment to a
Texas address identified in a contract Ahas engaged in no >activity= in Texas@); see also Nath, 238 S.W.3d
at 501 (A[E]mployment of ten employees who
reside in Texas does not show purposeful availment because their residency is
based on their own choice or the requirement of a third party.@).[4]


D.        All Star=s Former Mail-Order Business








Buchanan bases another argument on a single sentence drawn from Huckins=s deposition: AUnder All-Star=s umbrella, a while back I owned a
wheel-and-tire shop, and it was a mail-order wheel-and-tire shop, so we would
mail out basically all over the country, you know, but it was all out of a
warehouse here in Denver.@  All Star sold this enterprise in February 2006.

Buchanan reasons that because Huckins testified that All Star mailed its
products Abasically all over the country@ and Texas is a part of this country,
All Star established minimum contacts with Texas.  We disagree.  There is no
evidence that All Star mailed any products to Texas, advertised or solicited
orders in Texas, conducted business in Texas, or otherwise directed its
activities here.

E.        Purchases
from Texas Vendors

Lastly, Buchanan points out that All Star made regular purchases from
Texas vendors who then shipped the purchased material to All Star in Colorado,
and on two occasions, All Star sent an employee to Texas to take possession of
a truck purchased from a Texas vendor or broker.  But as previously discussed,
it is well-established that, without more, purchases and related trips are not
a sufficient basis for general jurisdiction.  Helicopteros, 466 U.S. at
417 (citing Rosenberg Bros. & Co. v. Curtis Brown Co., 260 U.S. 516,
518 (1923));  PHC-Minden, 235 S.W.3d at 170 (same).  Although one of
these trucks was used at the same site where Jay was killed, Buchanan does not
allege that itCor any other equipment purchased from a Texas vendorCplayed a role in the accident or in
Jay=s death. 

In sum, our review of the record has revealed no allegations or evidence
of a substantial connection between the operative facts of this litigation and
any of All Star=s Texas contacts.  Hence, we conclude that the trial court=s ruling denying All Star=s special appearance cannot be
affirmed based on specific jurisdiction.  Moreover, the jurisdictional
evidence, taken together, is insufficient to support the conclusion that All
Star had continuous and systematic contacts with Texas such that it became
subject to the exercise of general jurisdiction.








F.        Fair Play and Substantial Justice

Consideration of the factors relevant to the fairness analysis does not
support a conclusion that the exercise of personal jurisdiction over All Star
accords with traditional principles of fair play and substantial justice.  All
Star=s Texas contacts fall far short of
the minimum required, and Texas has no interest in adjudicating the claims of
one nonresident against another regarding a tort that allegedly occurred and
caused damage elsewhere and that does not concern Texas law, Texas property,
other Texas litigation, or some similar connection to this state.  The interests
of convenience, efficiency, and coequal sovereignty are all better served by
litigation in Colorado.  See Guardian Royal Exch., 815 S.W.2d at 231; see
also Brittingham‑Sada de Powers v. Ancillary Estate of Brittingham‑McLean, 
158 S.W.3d 518, 525 (Tex. App.CSan Antonio 2004, pet. denied) (noting in its fairness
evaluation that there was no evidence that the foreign court most closely
connected to the parties and relevant facts lacked jurisdiction  to resolve the
claims presented).

The only argument presented concerning the last Afairness factor@Ci.e., that of the states= shared interest in furthering
fundamental substantive social policiesCis Buchanan=s assertion that allowing litigation
to proceed in Texas is Amore fair than requiring [her] to litigate against hometown
companies in their own community, which would further social policies of
fairness in the judicial system for all litigants, not just the Colorado
locals.@[5]  Because this unsupported argument
is inimical to the presumption that judges and prospective jurors are
impartial,[6] we
categorically reject it.[7] 








We conclude that the record does not support the trial court=s exercise of personal jurisdiction
over All Star.  We therefore reverse the trial court=s order denying All Star=s special appearance and remand those
claims with instructions to the trial court to sever and dismiss them.

V.  Antero

On appeal, Antero first argues that it Asatisfied its burden to negate all
bases of personal jurisdiction by presenting evidence demonstrating that it was
a nonresident.@  Although this might be sufficient if Buchanan pleaded no jurisdictional
facts,[8] Buchanan did
plead that the defendants conduct business here and maintain continuing,
systematic contacts with Texas.  The record further suggests that in addition
to general jurisdiction, specific jurisdiction was tried by consent.  We
therefore consider whether the record supports a finding of jurisdiction on
either basis.  But because two AAntero Resources Corporations@ are discussed in the record, we must
begin with some clarification as to which AAntero@ is at issue.  

According to a Certificate of Merger filed in Delaware on April 1, 2005,
the original Antero Resources Corporation (AAntero I@) merged with XTO Barnett, Inc., and
the principal place of business of the surviving company, also known as Antero
Resources Corporation, is in Fort Worth, Texas.  That company is not the same AAntero@ that is a defendant and appellant in
this suit, and we do not consider its Texas contacts.[9]









The AAntero Resources Corporation@ involved in this case was formerly
known as AAntero Resources II Corporation@ and was formed in May 2004.  It is
identified as a Delaware corporation in a certificate of assumed business name
filed in Texas on May 13, 2004.[10]  On January
17, 2006, a name-change certificate filed with the Texas Secretary of State demonstrates
that the name of Antero Resources II Corporation was changed to Antero
Resources Corporation.  At that time, Antero had an office and a registered
agent at the same Houston address.  It further appears that Antero previously
owned Texas assets, but sold its Texas assets and operations to a Texas
corporation, EXCO Resources, Inc. (AEXCO@), in 2006.   

A.        Continuous, Systematic Contacts

In support of its special appearance, Antero relies on the affidavit of
Alvyn Schopp, Antero=s vice president of administration and accounting.  Schopp
attested that Antero is not a resident of Texas and does not maintain any
business offices here, but instead is a Delaware corporation with a principal
place of business in Denver, Colorado.  On the other hand, Antero=s April 10, 2006 Purchase and Sale
Agreement with EXCO identifies Antero as a Texas corporation.  Antero does not
address this contradictory evidence, and we presume the trial court resolved
the conflict in Buchanan=s favor.  See BMC Software, 83 S.W.3d at 795.








Although  Schopp also averred that Antero Adid not conduct any business, enter
into any contracts, or have any other business dealings in the State of Texas,@ he made this representation only Awith respect to the accident made the
basis of this lawsuit.@[11]  As a result of this qualification, Schopp=s denial is directed only to specific
jurisdiction, but he does not deny the general jurisdictional fact that Antero
conducted business in Texas.  Moreover, he conceded in his deposition that
Antero was operating in Texas prior to May 16, 2006, and continues to have a
Texas franchise-tax license, a license to operate oil wells in Texas, and
ownership of three Texas subsidiaries.  Standing alone, ownership of a
subsidiary operating in the forum state is not sufficient to establish general
jurisdiction, but it is a factor to be considered.  See Villagomez v.
Rockwood Specialties, Inc., 210 S.W.3d 720, 732 (Tex. App.CCorpus Christi 2006, pet. denied).

Antero urges us to treat as virtually dispositive the fact that it sold
its Texas assets to EXCO in 2006 and currently does not conduct business here. 
We agree that a business, having once established minimum contacts with a
particular forum, is not forever bound to personal jurisdiction in that state,
but instead may choose to sever those connections.  See World-Wide
Volkswagen Corp., 444 U.S. at 297.  We therefore accord this factor the
significance to which it is entitled.  See Equitable Prod. Co. v.
Canales-Treviño, 136 S.W.3d 235, 237 (Tex. App.CSan Antonio 2004, pet. denied)
(noting that relocation is a significant factor in minimum-contacts analysis). 
But relocation from the forum state is only one of the factors to be considered
in a minimum-contacts analysis, id., and we are bound to consider all of
the defendant=s contacts Aover a reasonable number of years, up to the date suit is
filed.@  PHC-Minden, 235 S.W.3d at
170 (quoting Charles W. ARocky@ Rhodes, The Predictability Principle in Personal
Jurisdiction Doctrine: A Case Study of the Effects of a AGenerally@ Too Broad, but ASpecifically@ Too Narrow Approach to Minimum
Contacts, 57 Baylor L. Rev. 135, 239 (2005) and
citing Access Telecom, Inc. v. MCI Telecomms. Corp., 197 F.3d 694, 717
(5th Cir. 1999)).  As previously discussed, such Acontacts@ include purchases, meetings,
choice-of-law clauses, and choice-of-forum clauses.  Although it is not
accorded the same significance as evidence of relocation, we also consider
evidence that a non-resident corporation is registered to do business in Texas
and maintains a registered agent for service of process.  See Conner,
944 S.W.2d at 414 (citing Wenche Siemer v. Learjet Acquisition Corp.,
966 F.2d 179, 183 (5th Cir. 1992)).  








Under the applicable standard of review, we conclude that the evidence is
insufficient to support a conclusion that Antero is subject to specific
jurisdiction; there is no substantial connection between Antero=s Texas contacts and activities and
the operative facts of this litigation.  But the same evidenceCparticularly the conflicting evidence
that Antero is a Texas corporation and the undisputed evidence that Antero had
an office in Houston and regularly conducted business in Texas from the date of
its incorporation in 2004 through May 16, 2006Cis sufficient to support an implied
finding that for Aa reasonable number of years@ before Buchanan sued Antero in
August 2007, Antero has had substantial systematic and continuous business
contacts with Texas supporting the exercise of general jurisdiction.  Other
evidence cited by Buchanan reveals more attenuated contacts with Texas, and
while such evidence might reinforce our conclusion that Antero deliberately
affiliated itself with Texas, see Burger King, 471 U.S. at 482, this
evidence was entitled to and accorded less significance in our minimum-contacts
analysis.[12]  








B.        Fair Play and Substantial Justice

Because Antero purposefully availed itself of the privileges and benefits
of conducting business in Texas, it could avoid the exercise of personal
jurisdiction only by presenting a compelling argument that subjecting it to
litigation here would not comport with traditional notions of fair play and
substantial justice.  See Guardian Royal Exch., 815 S.W.2d at 231. 
Antero argues, and we agree, that Texas has no distinct interest in litigating
Buchanan=s claims here.  See Asahi Metal
Indus. Co., Ltd. v. Superior Court of Calif., Solano County, 480 U.S. 102,
114 (1987) (ABecause the plaintiff is not a California resident, California=s legitimate interests in the dispute
have considerably diminished.@).  But this factor, without more, is not Acompelling.@

Antero also asserts that it would be onerous and impractical to transport
Athe entirety of this case, including
witnesses, the parties, their lawyers, and physical evidence, across state
lines for pretrial proceedings and trial.@  Antero cites no evidence in support
of this contention, and considering that Antero regularly conducted business in
Texas for most of its existence before this suit was filed, the extent of the
burden posed by this litigation is not readily apparent.  The record instead
demonstrates that Antero employees already travel to Texas for business
meetings, and Antero has been represented by Texas attorneys throughout its
existence, both in this litigation and for corporate legal advice.  Moreover,
it is not necessarily true that litigation in Texas of Buchanan=s claims against Antero would require
the entirety of the case to be transported across state lines.  For example,
Schopp, Huckins, and Glen McAlister, Frontier=s managing director, each were
deposed in Colorado.  Schopp further admitted in his deposition that he had no
evidence to support the assertion that physical evidence would have to be
transported across state lines.








We conclude that Antero has not presented a compelling argument that
Buchanan=s claims against it present a rare
instance in which the trial court=s exercise of personal jurisdiction
over a nonresident defendant who has purposefully established minimum contacts
with the forum state violates traditional notions of fair play and substantial
justice.  See Guardian Royal Exch., 815 S.W.2d at 231. We therefore
affirm the trial court=s denial of Antero=s special appearance. 

VI. 
Piceance

Piceance is the entity that operated the well at the site of the
accident.  It asserted in its verified special appearance that it is a Delaware
corporation with a principal place of business in Denver, Colorado and no
business offices or business dealings in Texas.  According to the record
evidence, Piceance has no subsidiaries, and although it has purchased goods or
services from Texas vendors for use outside the state, its operations are confined
to the State of Colorado.  Since its incorporation in 2006, Piceance has
received legal advice from attorneys at the Houston branch of Vinson &
Elkins.  As previously discussed, however, it is well-established that such
evidence, without more, is legally insufficient to establish that a foreign
corporation maintained continuous and systematic contacts with the forum
state.  See Helicopteros, 466 U.S. at 417; Rosenberg Bros. & Co.,
260 U.S. at 518; PHC-Minden, 235 S.W.3d at 170.  Thus, Piceance has
insufficient contacts to support the exercise of general jurisdiction.  Due to
the absence of a substantial connection between Piceance, Texas, and the
operative facts of the litigation, the exercise of specific jurisdiction also
is unsupported.  Finally, the fairness considerations cited by Buchanan are the
same as those made regarding All Star, and for the reasons previously
discussed, these are inadequate to justify the exercise of personal
jurisdiction based on contacts that fall so far short of the minimum.

  A.     Jurisdictional
Veil-Piercing








Buchanan also attributes Antero=s contacts to Piceance, arguing that
the two companies constitute a single business enterprise[13]
or are alter egos of one another.  To pierce the corporate veil for
jurisdictional purposes, a plaintiff must prove that one company Acontrols the internal business
operations and affairs@ of the other to such an extent that Athe two entities cease to be separate
so that the corporate fiction should be disregarded to prevent fraud or
injustice.@  BMC Software, 83 S.W.3d at 799.  As the party seeking to ascribe
one corporation=s actions to another by disregarding their distinct corporate
entities, Buchanan bore the burden to prove these allegations.  See id.
at 798. 

In determining whether a plaintiff asserting personal jurisdiction has
overcome the presumption of corporate separateness, courts may consider, inter
alia, (1) the amount of stock in one company that is owned by its
affiliate; (2) whether the entities have separate headquarters, directors,
and officers; (3) whether corporate formalities are observed; (4) whether
the entities maintain separate accounting systems; and (5) whether one
company exercises complete control over the other=s general policies or daily
activities.  Freudensprung v. Offshore Technical Servs., Inc., 379 F.3d
327, 346 (5th Cir. 2004).  These factors are not of uniform significance, as is
illustrated by Cannon Manufacturing Co. v. Cudahy Packing Co., 267 U.S.
333 (1925).  In Cannon, a North Carolina plaintiff sued a Maine
corporation and served process on the defendant=s wholly-owned Alabama subsidiary. 
The Supreme Court refused to attribute the subsidiary=s forum contacts to the parent
corporation, and explained its reasoning as follows:








Through ownership of the entire capital stock and
otherwise, the [Maine] defendant dominates the Alabama corporation, immediately
and completely, and exerts its control both commercially and financially in
substantially the same way, and mainly through the same individuals, as it does
over those selling branches or departments of its business not separately
incorporated which are established to market the [plaintiff=s] products in other states.  The existence of
the Alabama company as a distinct corporate entity is, however, in all respects
observed.  Its books are kept separate.  All transactions between the two
corporations are represented by appropriate entries in their respective books
in the same way as if the two were wholly independent corporations.

 

Id. at 335.  The Court further stated
that A[t]he corporate separation, though
perhaps merely formal, was real.  It was not pure fiction.@  Id. at 337.  Stated
differently, a Ablurring of the distinction@[14] between entities is insufficient to
support jurisdictional veil-piercing, because if affiliated companies maintain
separate and distinct corporate entities, the presence of one in a forum state
may not be attributed to the other.  Hargrave v. Fibreboard Corp., 710
F.2d 1154, 1160 (5th Cir.1983).

Here, Buchanan argues that Antero, Piceance, and other companies have Apublicly represented such unity@ that they should be treated as one. 
In support of this assertion, she cites evidence that (1) Antero and
Piceance have common employees; (2) Schopp is the vice-president of accounting
and administration for both companies; (3) employees have stock options in both
entities; (4) Antero and Piceance have a single business office; and (5) both
companies use a letterhead styled simply, AAntero Resources.@  These facts, however, are legally
insufficient evidence that Antero or Piceance controls the other.  See, e.g.,
U.S. LED, Ltd. v. Nu Power Assocs., Inc., C.A. No. H-07-0783, 2008 WL
4838851, at * 6 (S.D. Tex. Nov. 5, 2008) (slip op.) (finding stock ownership,
shared office space and employees, and provision of unpaid services and
training insufficient to support jurisdictional veil-piercing under an alter-ego
theory absent evidence that one company Aexercised meaningful, much less >complete,= control over [the other=s] daily activities@).








Although the employees common to Antero and Piceance were paid by Antero,
this is not evidence of an abnormal degree of control; the evidence instead is
undisputed that Antero billed the affiliated entity for services rendered by
the employees, and the affiliated entity remitted payment to Antero for such
services.  Cf. PHC-Minden, 235 S.W.3d at 176 (rejecting jurisdictional
argument that three officers of the subsidiary corporation were paid by the
parent company and explaining that the salaries were intercompany payables
funded by the subsidiary=s revenue); BMC Software, 83 S.W.3d at 799 (explaining
that evidence that parent corporation performed services for its subsidiary
would not support jurisdictional veil-piercing absent evidence that the
subsidiary was not charged for such services); Conner, 944 S.W.2d at 419B20 (rejecting attempt to pierce the
corporate veil under an alter-ego theory and citing evidence that parent
corporation billed subsidiary for services rendered by parent=s employees).  Evidence that Schopp
held the same office in both companies also is inadequate, because to Afuse@ the two corporations for
jurisdictional purposes, Buchanan was required to produce evidence that the
degree of control exercised by one company over the other was Agreater than that normally associated with
common ownership and directorship.@  BMC Software, 83 S.W.3d at
799 (emphasis added).  Thus, duplication  of some or all of the directors and
officers is not evidence of such control.  Id.  And as the Texas Supreme
Court explained in BMC Software, the use of letterhead containing parts
of the entities= names that are common to both companies is no evidence that
the two entities fail to observe corporate formalities.  Id. at 800; see
also PHC‑Minden, 235 S.W.3d at 175 (AWhether two related entities share a
common name, however, does not affect whether each has sufficient contacts with
the forum for jurisdictional purposes.@). 








Although Buchanan further contends that Antero pays Piceance=s service vendors, we cannot draw
this inference.  In support of this assertion, Buchanan cites evidence that
vendors addressed invoices for goods or services obtained for rigs operated by
Piceance to AAntero,@ AAntero Resources,@ or AAntero Resources Corp.@  Invoices, however, are not evidence
of payment by a particular defendant.  Moreover, the invoices are addressed by
the vendors, not by Antero or Piceance, and our jurisdictional inquiry is
focused only on the defendants= conduct, not on the actions of third parties.  Burger
King, 471 U.S. at 475; U‑Anchor Adver., 553 S.W.2d at 763. 
Finally, inasmuch as the names of a number of affiliated companies begin with
the words AAntero Resources,@ it is at least as likely that the vendors were referring to AAntero Resources Piceance
Corporation,@ the entity that actually operated the site, rather than to an affiliated
company.  See BMC Software, 83 S.W.3d at 800.  Thus, under the
equal-inference rule, these invoices are no evidence that vendors providing
goods and services for operations at the site contracted with or through Antero
or were paid by an entity other than Piceance.  See City of Keller v. Wilson,
168 S.W.3d 802, 813B14 (Tex. 2005) (discussing the equal-inference rule); Lee
v. Hasson, 286 S.W.3d 1, 23 (Tex. App.CHouston [14th Dist.] 2007, pet.
denied) (applying the equal-inference rule).  To the contrary, the evidence is
uncontroverted that Piceance paid its vendors directly from its own bank
account.








In sum, the evidence is uncontroverted that Antero and Piceance maintain
separate books, each pays its own independent contractors, and neither company
invests in the other, whereas the evidence on which Buchanan relies is
insufficient to overcome the presumption that the two separate corporations are
distinct entities.  See BMC Software, 83 S.W.3d at 798.  Indeed, we
previously have considered evidence much stronger than this and held it
insufficient to support jurisdictional veil-piercing.  See, e.g., Conner,
944 S.W.2d at 419B20.[15]  Because the
evidence is insufficient to support the trial court=s exercise of personal jurisdiction
over Piceance based on its own contacts, and Antero=s contacts may not be imputed to
Piceance, we sustain Piceance=s sole issue on appeal.  Accordingly, we reverse the trial
court=s order denying Piceance=s special appearance and remand for
dismissal and severance of Buchanan=s claims against it.

VII. 
Frontier

According to the record evidence, Frontier is a limited liability
corporation with its principal office in Colorado and registered to do business
in Oklahoma, Colorado, Utah, and North Dakota.  Frontier stores, builds, and
services rig equipment in Roosevelt, Utah and Oklahoma City, Oklahoma and
conducts drilling operations in Colorado and Utah.  All of its accounting
offices are in Oklahoma City.  Frontier is not registered to do business in
Texas, owns no property in Texas, conducts no advertising or marketing in
Texas, and employs no Texas residents.

As evidence that Frontier has established minimum contacts with Texas
sufficient for the exercise of general or specific jurisdiction, Buchanan
relies on evidence that Frontier made purchases from and visited Texas vendors,
is a party to other litigation in Texas, and recruits Texas residents through
an interactive website.  For the reasons discussed below, we conclude that this
evidence, considered collectively, is insufficient to support the exercise of
personal jurisdiction. 

A.        Relationships with Texas Vendors

As evidence that Frontier has sufficient contacts with Texas to allow
Texas appropriately to exercise personal jurisdiction, Buchanan first relies on
Frontier=s purchases from and visits to Texas
vendors.  Specifically, there is evidence that Frontier has purchased equipment
or services from approximately a dozen Texas vendors,[16]
and Frontier=s managing director, Glen McAlister, has visited five vendors in Texas.[17] 









At least three Texas vendors supplied materials used in constructing or
operating Rig No. 3, which Frontier built at its facility in Roosevelt, Utah:  

$       
The rig is constructed from steel
obtained from Lake Steel in Amarillo, but Frontier personnel have not visited
Lake Steel=s Texas facility.  

 

$       
The rig incorporates a blow-out
preventer (ABOP@) that was
purchased from Challenger Equipment (AChallenger@) in Tomball, Texas after Challenger sent a quote for
the BOP to Frontier=s office in Oklahoma City.  Challenger then shipped
the equipment to Frontier.  

 

$       
Frontier purchased drill string
used on Rig No. 3 from Downhole Pipe & Equipment (ADownhole@). 
Although Downhole is located in Sugar Land, Texas, the equipment purchased by
Frontier originated in China and was shipped to Frontier through Long Beach,
California.  Although McAlister previously has visited Downhole=s Texas office, he has not done so since founding
Frontier.  

 

Frontier also
may have purchased unspecified equipment for Rig No. 3 from Voorhees Equipment
& Consulting, a Houston equipment dealer that McAlister has visited twice. 
Finally, Frontier purchases rig supplies from sales representatives who visit
the rigs, but Frontier personnel generally do not know whether companies who
employ such representatives are based in Texas;  Frontier pays local sales tax
for such purchases. 








We hold that Frontier=s Texas purchases and visits do not support the exercise of
specific jurisdiction because no allegations or evidence substantially connect
them to the accident, to Jay Buchanan=s death, or to any of the elements of
Buchanan=s claims.  We further conclude
Frontier=s contacts with Texas vendors,
considered together with the other jurisdictional evidence discussed below, do
not rise to a level that can be considered sufficiently continuous and
systematic so as to support the exercise of general jurisdiction.  See
Helicopteros, 466 U.S. at 411B18 (declining to exercise
jurisdiction over a helicopter company that purchased spare parts, accessories,
and eighty percent of its fleet from a Texas helicopter manufacturer, sent its
pilots for training in Texas, and transported helicopters from Texas); Moni
Pulo Ltd. v. Trutec Oil & Gas, Inc., 130 S.W.3d 170, 175B76 (Tex. App.CHouston [14th Dist.] 2003, pet.
denied) (A[N]egotiating and signing a contract in Texas is insufficient if
performance takes place elsewhere.@); 3‑D Elec. Co. v. Barnett
Constr. Co., 706 S.W.2d 135, 138B40 (Tex. App.CDallas 1986, writ ref=d n.r.e.) (holding negotiations and
agreement by telephone and mail between Tennessee general contractor and Texas
subcontractor insufficient to establish personal jurisdiction of the former in
Texas because the work was performed in Colorado). 

B.        Texas Litigation








Buchanan next points out that Frontier is a defendant and
counter-claimant in a ATexas@ lawsuit.  The lawsuit to which Buchanan refers is a federal
lawsuit based on diversity and, apparently, specific jurisdiction.  See Jake=s Equip. & Repair, Inc. v.
Frontier Drilling L.L.C. and Advanced Rig & Equip., Inc., C.A. No. H-08-1360 in the United
States District Court for the Southern District of Texas, Houston Division.  
But we again must point out that our jurisdictional inquiry focuses upon a
nonresident defendant=s contacts with the forum state for Aa reasonable number of years@ before suit was filed.  See
PHC-Minden, 235 S.W.3d at 170.  Here, the uncontroverted evidence
establishes that the Jake=s Equipment litigation was filed sometime
between January 28, 2008, when McAlister attested that AFrontier has never been sued in the
State of Texas,@ and May 22, 2008, when McAlister stated in his deposition
that Frontier had been sued in Texas by Jake=s Equipment.  And although Frontier
does assert a state-law counterclaim in that action, the pleading in which the
claim is asserted was filed in mid-2008, many months after Buchanan sued
Frontier.  As the only evidence concerning the federal lawsuit is dated after
the time that Buchanan sued Frontier, it is beyond the scope of our
minimum-contacts inquiry.[18] 

C.        Interactive Website








Finally, Buchanan contends that Frontier=s interactive website provides a
basis on which to establish jurisdiction.  In cases involving interactive websites,
jurisdiction is determined by the degree of interaction.  Experimental
Aircraft Ass=n, Inc. v. Doctor, 76 S.W.3d 496, 506B07 (Tex. App.CHouston [14th Dist.] 2002, no pet.). 
AInternet use is characterized as
falling within three categories on a sliding scale for purposes of establishing
personal jurisdiction.@  Michel v. Rocket Eng=g Corp., 45 S.W.3d 658, 677 (Tex. App.CFort Worth 2001, no pet.) (citing Jones
v. Beech Aircraft Corp., 995 S.W.2d 767, 772 (Tex. App.CSan Antonio 1999, pet. dism=d w.o.j.)). AAt one end of the scale are websites
clearly used for transacting business over the Internet, such as entering into
contracts and knowing and repeated transmission of files of information, which
may be sufficient to establish minimum contacts with a state.@  Reiff v. Roy, 115 S.W.3d
700, 705 (Tex. App.CDallas 2003, pet. denied) (citing Michel, 45 S.W.3d at
677); see also Moki Mac, 221 S.W.3d at 586 (drawing an analogy between
jurisdictional inquiries based on advertising in the forum state and
allegations that the nonresident defendant attempted to recruit forum
residents); Weber v. Jolly Hotels, 977 F. Supp. 327, 333B34 (D.N.J. 1997) (comparing internet
advertising to advertising in a national magazine and noting that internet
advertising Ais not tantamount to directing activity at or to purposefully availing
oneself of a particular forum@).  On the other end of the spectrum are Apassive@ or Ainformational@ websites that are used only for
purposes such as advertising Aand are not sufficient to establish minimum contacts even
though they are accessible to residents of a particular state.@  Michel, 45 S.W.3d at 677. 
Between these two extremes are A>interactive= websites that allow the >exchange= of information between a potential
customer and a host computer.@  Id.; Reiff, 115 S.W.3d at 706. 

Frontier=s website is interactive, and anyone viewing the website may submit an
online application for employment; however, it is stated on the site, AIf interested in applying for a
position with Frontier Drilling, please note that all operations are taking
place in Utah and Colorado.  If you need to talk to somebody, please contact
our Roosevelt, UT office . . . .@  There is no evidence that Texas
residents are targeted for recruitment; to the contrary, the site is accessible
by A[a]nybody in the world.@  Although visitors can post comments
about Frontier and subscribe to its Afeed,@ there is no evidence that it makes
sales or contracts through the site, and no evidence that Frontier can even
respond to applications, comments, or queries through the website.  We
therefore conclude that the website is too Apassive@ to establish systematic and
continuous contacts sufficient to support general jurisdiction.  See, e.g.,
Reiff, 115 S.W.3d at 706 (hotel=s website that allowed online
reservations did not support jurisdiction); Bell v. Imperial Palace
Hotel/Casino, Inc., 200 F. Supp. 2d 1082, 1091 (E.D. Mo. 2001) (same); Dagesse
v. Plant Hotel N.V., 113 F. Supp. 2d 211, 224 (D.N.H. 2000) (no evidence
defendant used website to conduct commercial transactions or other activities
with residents of forum); see also Michel, 45 S.W.3d at 678 (website did
not support jurisdiction where operator could not directly respond to internet
inquiries through website); Riviera Operating Corp. v. Dawson, 29 S.W.3d
905, 911 (Tex. App.CBeaumont 2000, pet. denied) (same); Daimler‑Benz
Aktiengesellschaft v. Olson, 21 S.W.3d 707, 725 (Tex. App.CAustin 2000, pet. dism=d w.o.j.) (interactive website that
allowed Texas residents to submit comments and questions and receive electronic
mailings but did not allow sales or other contracts is a factor to consider in
evaluating jurisdiction).

D.        Fair Play and Substantial Justice           








Concerning the due-process requirement that the exercise of personal
jurisdiction comport with traditional notions of fair play and substantial
justice, Buchanan repeats the same arguments made with respect to All Star and
Piceance.  We reject those arguments for the same reasons previously stated:
Texas has no interest in adjudicating Buchanan=s claims against Frontier, and the
interests of convenience, efficiency, and coequal sovereignty are all better
served by litigation in Colorado.  See Guardian Royal Exch., 815 S.W.2d
at 231.

There being no basis on which to affirm the trial court=s exercise of personal jurisdiction
over Frontier, we reverse the trial court=s order denying Frontier=s special appearance and remand with
instructions to the trial court to sever and dismiss those claims.

VIII. 
Conclusion

We hold that Antero has maintained continuous and systematic contacts
with Texas for a reasonable number of years prior to this suit, and the
exercise of general jurisdiction over it comports with traditional notions of
fair play and substantial justice.  We therefore overrule Antero=s sole issue on appeal and affirm the
trial court=s order denying Antero=s special appearance.  But because the exercise of personal
jurisdiction over All Star, Piceance, and Frontier is not supported by the
existence of minimum contacts and the interests of fair play and substantial
justice, we sustain the issues each has presented, reverse the trial court=s orders denying their respective
special appearances, and remand the case with instructions to sever and dismiss
Buchanan=s claims against All Star, Piceance,
and Frontier.

 

 

 

 

/s/        Eva M. Guzman

Justice

 

Panel
consists of Justices Anderson, Guzman, and Boyce. 









[1]  Buchanan argues that the Oxy contract was for work
to be performed at the Piceance Basin, but the contract was produced in
response to a Request for Production from April 2008 that sought A[a]ll written contracts related to work [All Star] has
performed at the Piceance Basin in Rifle, Colorado from 2002 to the present.@ (emphasis added).  Buchanan does not identify how the
contract is related to the facts of this case, and there is no evidence that
All Star performed work pursuant to the contract before Buchanan filed suit
against it on August 30, 2007.  See PHC-Minden, 235 S.W.3d at 170.





[2]  Although choice-of-law provisions may be considered
in the jurisdictional analysis, we note that individuals are free to Astructure their primary conduct with some minimum
assurance as to where that conduct will and will not render them liable to
suit.@ World-Wide Volkswagen, 444 U.S. at 297.  In
addition,  application of another state=s laws
can be used to bring predictability to the contract while circumventing
jurisdictional problems.  See Burger King, 471 U.S. at 476B77 (discussing the application of the forum state=s choice-of-law rules to apply the Afundamental substantive social policies of another
State@ (citing Allstate Ins. Co. v. Hague, 449 U.S.
302, 307B13 (1981) (plurality op.))). 





[3]  For the sake of completeness, we note that Buchanan
cites no evidence that All Star actually mailed invoices to Oxy=s Texas address. 





[4] Buchanan also refers us to evidence that an All Star
employee residing in Colorado wrote a Texas address on his W-4 form, but the
only identified date of this person=s
employment was December 2007, after suit was filed.  But see PHC-Minden,
235 S.W.3d at 170 (holding that courts are to consider the nonresident
defendant=s presuit contacts).





[5]   Buchanan does not contend, however, that litigation
in Harris County, Texas, where defendant Halliburton maintains its principal
place of business, subjects her to similar unfairness from litigating Aagainst hometown companies in their own community.@





[6]  See Murphy v. Florida, 421 U.S. 794, 800B01 (1975) (discussing presumption that prospective
jurors are impartial); Fowler v. Buckner, 23 Tex. 84 ,1859 WL 6250, at
*3 (1859) (explaining that judges are presumed to be impartial).





[7]  See M/S Bremen v. Zapata Off‑Shore Co.,
407 U.S. 1, 12 (1972); see also In re AIU Ins. Co., 148 S.W.3d 109, 114
(Tex. 2004) (rejecting as Ahighly
offensive to a system of justice based on the rule of law@ the suggestion that a tribunal should consider the
benefits to the local community in presiding over a case regarding insurance
proceeds that would Abenefit Texans or Texas businesses@). 





[8]  See Experimental Aircraft Ass=n, Inc. v. Doctor, 76 S.W.3d 496, 502 (Tex. App.CHouston
[14th Dist.] 2002, no pet.).





[9]  These contacts include oil and gas properties and
leases in Texas and letters of credit from several Texas cities and the Texas
Railroad Commission.





[10]  The Certificate identified the company=s assumed name as AAntero
II Resources Corporation.@





[11]  Schopp further testified that Antero did not own or
operate the well site or equipment involved in the accident and that no Antero
employees were present at the well site at the time of the accident.





[12]  For example, Buchanan cites evidence that Antero
sends royalty payments to addresses in Texas concerning its oil and gas leases
in Oklahoma and Colorado, and two employees who work for Antero in Oklahoma
actually reside in Texas.  As previously discussed, however, a third party=s choice of residence, whether a royalty-interest
owner or an employee, is not conduct by the nonresident corporation directed at
the forum state.  See Burger King, 471 U.S. at 475; U‑Anchor
Adver., 553 S.W.2d at 763.  Buchanan additionally asserts that Antero
employee and Texas resident Ivan AJohn@ Kawcak owns preferred stock in Antero, but again,
this is not conduct by Antero.  Kawcak also drives a vehicle owned by Antero,
but he Aoffices@ in
Oklahoma and the record evidence does not identify the state in which the
vehicle is registered or used.  It also is undisputed that another Antero
employee, Steve Woodward, traveled to Texas to meet with Agathering companies@
for Antero=s natural gas plants in Oklahoma, but the record does
not identify whether this trip occurred before or after suit was filed.  Schopp
testified only that the trip occurred within the six months preceding his
deposition, and the suit had been pending for more than four months at that
time.  Cf. PHC-Minden, 235 S.W.3d at 170 (explaining that
minimum-contacts analysis is concerned with the defendant=s presuit contacts).  

Buchanan further relies on
evidence that Antero and a company identified as AXTO Energy@ participate together in drilling oil wells in
Oklahoma; individual Antero shareholders also own stock in XTO Energy; and
Antero provided management services for AXTO
Energy entities@ until June 30, 2005.  She cites no evidence, however,
that XTO Energy is a Texas corporation or resident.  To the contrary, the
certificate of merger and a Aregistration
rights agreement@ on which Buchanan relied in the trial court
identifies AXTO Energy, Inc.@ as
a Delaware corporation.

Buchanan additionally points
to evidence that Antero purchased goods or services in Texas and remitted
payment to Halliburton Energy Services, Inc. in Houston for services rendered
at the rig in Colorado where the accident occurred.  She also places particular
emphasis on the fact that Antero obtains legal services from attorneys at the
Houston branch of Vinson & Elkins, an international law firm, and notes
that Schopp traveled to Houston to confer with Antero=s attorneys in June 2007.  But Buchanan identifies no
basis for treating a nonresident corporation=s
purchase of legal services differently from its purchase of other goods and
services, and we decline to do so.  See Helicopteros, 466 U.S. at 418
(explaining that a nonresident defendant=s
employees= visits to Texas for training were Ano more a significant contact@ than trips to purchase goods).  

 





[13]  Citing Paramount Petroleum Corp. v. Taylor Rental
Center, 712 S.W.2d 534 (Tex. App.CHouston
[14th Dist.] 1986, writ ref=d n.r.e.),
Buchanan argued, both in the  trial court and on appeal, that Antero, Piceance,
and other related entities should be treated as a single business enterprise
based on factors such as (1) common employees, (2) common offices,
(3) centralized accounting, (4) one business paying the wages of the other
business=s employees, (5) a common business name,
(6) services rendered by employees of one business on behalf of the other
business, (7) undocumented transfers of funds between businesses, and
(8) an unclear allocation of profits.  These are the factors described in Paramount
Petroleum to be considered in determining whether the
single-business-enterprise theory of liability applies.  That theory, however,
has been expressly rejected by the Texas Supreme Court.  SSP Partners v. Gladstrong
Invs. (USA) Corp., 275 S.W.3d 444, 456 (Tex. 2008).  

The
unavailability of the single-business-enterprise theory of liability does not
mean that Buchanan=s discussion of the same factors for jurisdictional
purposes is entirely misplaced, but because personal jurisdiction involves
due-process considerations that may not be overridden by statutes or the common
law, jurisdictional veil-piercing and substantive veil-piercing involve
different elements of proof.  See PHC-Minden, 235 S.W.3d at 174.  Hence,
some of the factors previously considered in determining whether two companies
acted as a single business enterprise still may be useful in determining
whether to disregard the corporate structure, see SSP Partners, 275
S.W.3d at 455, but others are irrelevant to jurisdictional analysis.  PHC-Minden,
235 S.W.3d at 174B75.  





[14]  Stuart v. Spademan, 772 F.2d 1185, 1198 (5th
Cir. 1985).





[15]  In Conner, we concluded that a parent and
subsidiary were not alter egos of one another even though the parent initially
capitalized the subsidiary; the companies shared headquarters and a bank
account; the office sign identified only the parent corporation; the phone was
answered solely on behalf of the parent corporation; employees were paid the
same benefits by the same payroll system; the parent=s employees provided legal, accounting, and other
services to the subsidiary; and half of the subsidiary=s revenue was produced by providing shipping services
to the parent corporation.  Conner, 944 S.W.2d at 419.





[16]  These vendors include (1) Challenger Equipment
in Tomball, (2) Downhole Pipe & Equipment in Sugar Land, (3) Jake=s Equipment in Houston, (4) Lake Steel in Amarillo,
(5) Omron in Houston, (6) Panalpina in Houston, (7) Pentagon Freight
Services in Houston, (8) Quality Bit & Supply Company in Houston,
(9) Southwest Oil Field Productions in Houston, (10) Townsend in Odessa,
and (11) Voorhees Equipment & Consulting in Houston.  





[17] McAlister visited Challenger Equipment once to view a
portable rig, but did not purchase it.  He also visited Jake=s Equipment three times; Omron an unspecified number
of times; Voorhees Equipment & Consulting twice; and Panalpina once. 
McAlister was questioned about invoices to M/D Totco, Texas Oil Patch Services,
Texas First Industrial, Trans-Pecos Trucking, Vista Sales & Service, and GB
International, but these companies were not specifically identified as Texas
companies or residents.  In addition, Frontier purchased goods or services in
Oklahoma, Utah, or Colorado from local offices of companies who may have additional
offices in Texas.  These companies include Lone Star Safety & Supply,
Simons Petroleum, T.H. Hill & Associates, W.G. Wood Group, WWL Industries,
Weatherford, and Wilson.  Buchanan also contends that Frontier employed
Houston-based inspectors to conduct inspections on its rigs, but this
contention is not supported by the record.  The evidence instead is
uncontroverted that the rig operator would have selected any inspection company
used.





[18]  Moreover, as previously discussed, a defendant=s failure to challenge the exercise of specific
jurisdiction in a different case does not demonstrate that it has the
continuous and systematic contacts with Texas necessary for the exercise of
general jurisdiction.  Nath, 238 S.W.3d at 501.